499 So.2d 750 (1986)
Grady SMITH
v.
STATE of Mississippi.
No. 55945.
Supreme Court of Mississippi.
November 26, 1986.
*751 Darryl A. Hurt, Hurt & Hurt, Lucedale, Joseph Q. White, Jr., Pascagoula, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., Jackson, for appellee.
En Banc.
WALKER, Chief Justice, for the Court on Parts I, II, and III.
HAWKINS, Presiding Justice, for the Court on Part IV.
WALKER, Chief Justice, for the court.
The appellant, Grady Smith, was indicted in the Circuit Court of Jackson County for the crime of capital murder arising out of the death of William Carter during the course of a burglary. He was then tried, convicted and sentenced to be executed. He appeals from that conviction and sentence.
On February 24, 1983, Grady Smith shot and killed William Carter. Smith testified in his own behalf. On the day in question he went to the home of Helen Loper, a widow. Following the death of Helen's husband, Smith helped her by making repairs in and around her trailer as well as offering financial assistance. Although he did not live with Ms. Loper, Smith testified they were man and wife as they had said their vows, without benefit of clergy, in her car outside her trailer on May 7, 1982. He vowed to, "... take this little woman, Helen Loper, to be my wife, to love and cherish until death do us apart, so help me, God." Only Smith, Helen and God were privileged to this information. They shared the news of their "marriage" with no one else for fear Helen would lose her widow's benefits from social security.
Upon arriving at Helen's, on February 24th, Smith realized William Carter was already at her trailer. Smith called Carter outside and asked why he (Carter) was there. According to Smith, Carter threatened to kill him saying, "You're not going to run me away from here, ... I'll kill you. You can't take her ... that she is a widow and I can demand ... control over her ... She's got something to say about it." Smith informed Carter that he was going to get his gun and would be back and "I would kill him before he killed me."
After getting his gun, Smith went looking for Carter at Carter's sister's trailer. Carter was not there and Smith assumed he (Carter) had gone to get a gun. Smith passed Carter on the road and followed him to the house of Helen Erckhart, another of Carter's sisters. Carter stopped, got out of his truck and ran toward the house. Smith believed Carter was going after a gun. Smith shot, and testified that Carter "was hit and hit hard." Carter fell and disappeared into the house. Smith ran up to the doorstep and observed Carter inside resting on one knee. Carter was still alive. Smith's plan was "to finish killing him or get killed." Helen Erckhart grabbed Smith's gun and pushed him off the doorstep. Both Helen and Smith tussled over the gun in the yard. Helen fell and Smith was able to free himself and the gun and ran back to the doorstep. He saw Carter stooped over by a bar-type counter "doing something behind the counter." Smith testified "I don't know whether he was getting a gun or trying to." Smith claimed he never entered the house but was on the doorstep when he shot Carter "over that bar counter." His testimony was that the front door opened into the kitchen and denied that the photographs entered into evidence of the front door depicted the door he approached when he fired the fatal shots.
Helen Erckhart testified that Smith got out of his truck armed with a gun and shot her brother before he was able to reach the house. Carter fell into the doorway and crawled into the living room. Smith followed Carter armed with his gun. Smith pointed the gun down at Carter and Helen picked it up and "pushed him back out the door." According to Helen, Smith knocked *752 her down and kept hitting her until he had control of the gun. She pleaded "with him not to do it, not to go back in the house." Helen stated "he (Smith) went on back in the house and shot two more times and then went on back out the back door and got in his truck."
The jury, after finding Smith guilty of capital murder, found the aggravating circumstances outweighed the mitigating circumstances and imposed the death penalty.

GUILT PHASE

I.

THE COURT ERRED IN REFUSING TO DIRECT A VERDICT IN FAVOR OF APPELLANT, IN THAT THE STATE FAILED TO MEET ITS BURDEN OF PROOF ON THE CHARGE OF CAPITAL MURDER.
Appellant asserts that although he was indicted for capital murder, i.e., the killing of a human being when done while engaged in the commission of the crime of burglary, the State failed to prove that there was a "breaking", a necessary element of the crime of burglary. He contends "If there was any breaking and entering, it was merely a continuation of a crime already in progress that had started outside the house in the yard."
Appellant was indicted for capital murder pursuant to Mississippi Code Annotated section 97-3-19(2)(e) (1972) as amended. The underlying felony charged elevating the crime of murder to capital murder was burglary. Burglary is defined in Mississippi Code Annotated section 97-17-21 (1972) in pertinent part as follows:
Every person who shall be convicted of breaking and entering, in the day or night, the dwelling house of another, in which there shall be, at the time, some human being, with intent to commit some crime therein, either by forcibly bursting or breaking . .. or by breaking in in any other manner ... shall be guilty of burglary... . (Emphasis added)
The testimony with regard to whether Smith entered Erckhart's home was conflicting. Smith denied he went into the house and alleged he fired the fatal shot from the outside doorstep.
The front door led into the living room which was approximately twelve (12) to fifteen (15) feet long. Taking a left and travelling this distance one would then step down into the kitchen area. The victim was found near a breakfast bar approximately another ten (10) to twelve (12) feet inside the kitchen. According to Dr. Dennis Magee, who performed the autopsy, the fatal shot was fired from close range, i.e., a distance of five (5) feet or less. The sheriff of George County, the county where the crime occurred, testified two spent shotgun shells were found in the kitchen area and one was found outside. Smith testified he fired once while Carter was in the house and the spent shell fell from the gun into the home. During trial Smith maintained the photographs depicting the front door was not the door where he stood when the fatal shot was fired. However, he could not explain how the front door got full of buckshot holes if it were not the door in the picture. He testified the front door, where he stood, led into the kitchen. Helen Erckhart testified the appellant entered at the front door which led into her living room. Karen Reeves, a relative of Erckhart's, testified she observed Carter go inside the front door, saw Smith as he approached the house, and watched as Helen pushed Smith back out of the house. She also observed Smith hit Helen, knock her down on the ground and then proceed inside the house.
In State v. Jolly, 297 N.C. 121, 254 S.E.2d 1 (1979), the defendant was convicted of first degree burglary and armed robbery and appealed to the Supreme Court of North Carolina. The court defined breaking as "... any act or force, however, slight, `employed to effect an entrance through any usual or unusual place of ingress, whether open, partly open, or closed.'" The court noted that a breaking could be actual or constructive and defined a constructive breaking as one which occurs *753 when entrance is obtained in consequence of violence commenced or threatened by defendant. The evidence in Jolly showed the defendant gained entry into the victim's motel room by pushing the victim into the room as he opened the door, constituting a constructive breaking.
In the case sub judice the jury could have and evidently did believe Erckhart's testimony that Smith forcibly entered her home through the front door over her protest after overpowering her by knocking her down as she tried to block his way and prevent his entry. We are of the opinion and so hold that Smith's acts constituted a breaking and entering contemplated by § 97-17-21 and that the defendant's motion for a directed verdict was properly overruled.

II.

THE COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO REDUCE THE CHARGE OF CAPITAL MURDER TO THAT OF MURDER.
The appellant asks this Court to adopt what is known as the "merger doctrine" whereby the crime of burglary, being an integral part of the murder under these facts, would merge into the crime of murder. If this Court should adopt this reasoning the appellant could only have been convicted of murder and not capital murder. His contention is premised on the theory that the burglary under the facts of this case is not a separate criminal act but is an integral part of the murder committed.
As this is a case of first impression, the appellant relies on decisions from the Courts of California to support his contention. In particular, he refers us to People v. Wilson, 1 Cal.3d 431, 82 Cal. Rptr. 494, 462 P.2d 22 (1969) wherein the California Supreme Court held that a burglary committed during the course of an independent intent to assault with a deadly weapon but which resulted in killing the victim constituted a single course of conduct with a single purpose and thus was included in fact within the charge of murder and could not support a felony-murder instruction.[1]
That court stated:
[t]he entry would be nonfelonious but for the intent to commit the assault, and the assault is an integral part of the homicide and is included in fact in the offense charged, utilization of the felony-murder rule extends that doctrine "beyond any rational function that it is designed to serve." We have heretofore emphasized "that the felony-murder doctrine expresses a highly artificial concept that deserves no extension beyond its required application."
82 Cal. Rptr. at 499, 462 P.2d at 28.
The reasoning of the court in Wilson was rejected by the Court of Appeals for the District of Columbia in Blango v. United States, 373 A.2d 885 (D.C. 1977). Both the appellants in Wilson and Blango argued that a burglary committed incidental to an assault that resulted in death could not properly serve as the predicate for a felony-murder conviction. The Blango court held that the application of the merger doctrine was not warranted not only because of the language of their felony-murder statute but also because of the significantly different societal interests served by the felony-murder and burglary statutes. The court reasoned that a killing subsequent to a burglary does not negate the fact of the burglary or invasion of the societal interests. The burglary is a separate and distinct act from the succeeding killing, yet may be deemed to be a continuing offense for purposes of the felony-murder statute. The court went on to say:
The thrust of that part of the felony-murder statute which relates to nonpurposeful killings is to increase the penalty *754 for such killings during the commission of certain enumerated felonies by implying from the commission of such felonies premeditation and deliberation ... The societal interest protected is security of the person and the value of human life, not the security of premises protected by the burglary statute.
373 A.2d at 888.
Blango committed a burglary by entering his victim's home with the intent to assault. The court found that Blango, after committing the burglary and having violated the societal interests, could have withdrawn from the premises without attacking his victim. Since Blango did kill the victim on the premises in the course of the burglary, the requirements of the felony-murder statute were satisfied and the fact of the killing did not negate the fact of the burglary.
The doctrine of merger was held inapplicable in Blango even though the appellant committed a series of acts which comprised one continuous transaction upon a finding that these acts offended multiple societal interests and constituted separate offenses.
The following expression of the Court of Appeals of New York in People v. Miller, 32 N.Y.2d 157, 344 N.Y.S.2d 342, 297 N.E.2d 85 (1973) aptly states this Court's view regarding the application of our felony-murder statute:
It should be apparent that the Legislature, in including burglary as one of the enumerated felonies as a basis for felony murder, recognized that persons within domiciles are in greater peril from those entering the domicile with criminal intent, than persons on the street who are being subjected to the same criminal intent. Thus, the burglary statutes prescribe greater punishment for a criminal act committed within the domicile than for the same act committed on the street. Where, as here, the criminal act underlying the burglary is an assault with a dangerous weapon, the likelihood that the assault will culminate in a homicide is significantly increased by the situs of the assault. When the assault takes place within the domicile, the victim may be more likely to resist the assault; the victim is also less likely to be able to avoid the consequences of the assault, since his paths of retreat and escape may be barred or severely restricted by furniture, walls and other obstructions incidental to buildings. Further, it is also more likely that when the assault occurs in the victim's domicile, there will be present family or close friends who will come to the victim's aid and be killed. Since the purpose of the felony-murder statute is to reduce the disproportionate number of accidental homicides which occur during the commission of the enumerated predicate felonies by punishing the party responsible for the homicide not merely for manslaughter, but for murder (see Model Penal Code, Tent. Draft No. 9, pp. 37, 38), the Legislature, in enacting the burglary and felony-murder statutes, did not exclude from the definition of burglary, a burglary based upon the intent to assault, but intended that the definition be "satisfied if the intruder's intent, existing at the time of the unlawful entry or remaining, is to commit any crime".
344 N.Y.S.2d at 345, 346, 297 N.E.2d at 87, 88.
We decline to adopt the merger doctrine and hold that under our felony-murder statute, the underlying felony does not merge into the murder. Our statutory provisions dealing with murder and the particular felony, in this case, burglary, are intended to protect different societal interests. When the appellant entered the home of Helen Erckhart with the intent to commit a crime therein, i.e., to kill Carter, the burglary was complete and the subsequent killing of Carter elevated the crime of murder to that of capital murder. We find the appellant's argument unpersuasive.

III.

BY GRANTING STATE'S INSTRUCTION S-3, THE TRIAL JUDGE VIOLATED APPELLANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL.
The appellant states: "The trial court in this case granted the defense instructions *755 on murder and manslaughter, but then totally ignored those lesser included offenses when informing the jury of the form of their verdict."
This argument has no merit because the jury was properly instructed by Defense Instructions D-3, and D-4 as to the form of the verdict to be used if they found appellant guilty only of murder or manslaughter. The State was entitled to and was granted, without objection, Instruction S-3 as to the form of the verdict to be applied upon the jury finding the appellant guilty of capital murder.
In my opinion this case should be affirmed as to the guilt phase as well as sentence of death imposed by the circuit court. See my dissent to Part IV of this opinion reversing this case.

IV.
HAWKINS, Presiding Justice, for the Court:
Smith assigns as error:
THE CIRCUIT COURT ERRED IN OVERRULING HIS MOTION FOR A MISTRIAL FOLLOWING HIS BEING ASKED A PREJUDICIAL AND INFLAMMATORY QUESTION DURING HIS CROSS-EXAMINATION BY THE STATE.
The record reveals that during the cross-examination of Smith, the following transpired:
Q. And your testimony then, Mr. Smith, is that the only reason that you killed Mr. Carter is because he had threatened you and you were afraid of him; is that true?
A. He threatened me and I threatened him that we would kill one another, and it was whoever was the fastest would get the job done and do it.
Q. And that was the whole motive for that killing that day; is that your testimony?
A. It was over my wife.
Q. Then I want you to tell this jury why you killed Helen Loper.
At the time the question was asked, there was no evidence in the record concerning the killing or death of Helen Loper, nor was there any evidence in the record that defendant had ever been convicted of a previous crime.
Counsel moved for a mistrial and following argument the court stated:
BY THE COURT: I'm afraid that that's not correct there. You can ask him ... the only question you can ask him is has he ever been convicted of another crime, and, if so, what the crime was. It's not necessary ... he has already testified what the motive was ... that he had threatened him. I'm afraid the position is well taken, but I'm going to overrule your motion. I'll let it go on to jury.
The court did admonish the jury to disregard as well as admonishing the attorney not to make reference to the killing of Helen Loper. When asked, all jurors indicated they could follow the court's instructions.
It is a well-settled rule that evidence of other crimes than the one for which the accused is being tried is inadmissible. West v. State, 463 So.2d 1048 (Miss. 1985); Mason v. State, 429 So.2d 569 (Miss. 1983); Johnson v. State, 416 So.2d 383 (Miss. 1982); and Gray v. State, 351 So.2d 1342 (Miss. 1977), cert. den., 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847.
There are exceptions to this rule as noted in Blair v. State, 445 So.2d 1373 (Miss. 1984), as follows:
... There are certain recognized exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so connected as to constitute one transaction, where it is necessary to identify the defendant, where it is material to prove motive and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to *756 prove scienter or guilty knowledge. Johnson v. State, 416 So.2d 383, 386 (Miss. 1982), quoting Gray v. State, 351 So.2d 1342.
445 So.2d at 1375.
In discussing the basis for the rule in West v. State, supra, we said:
The rationale of this rule is that the issue before the jury is singular and to allow other evidence would divert the jury's attention and prejudice the accused. As said in King v. State, 66 Miss. 502, 506, 6 So. 188, 189 (1889):
The general rule is, that the issue on a criminal trial, shall be single, and that the testimony must be confined to the issue, and that on the trial of a person for one offense, the prosecution cannot aid the proof against him, by showing that he committed other offenses. Whart. Cr.Ev., § 104, 1 Bish. Cr. Pro., § 1102 et seq. The reason and justice of the rule is apparent, and its observance is necessary to prevent injustice and oppression in criminal prosecutions. Such evidence tends to divert the minds of the jury from the true issue, and to prejudice and mislead them, and while the accused may be able to meet a specific charge, he cannot be prepared to defend against all other charges that may be brought against him.
463 So.2d at 1051-52.
In cases where the death penalty has been imposed, thoroughness and intensity of review are heightened. What may be harmless error in a case where less is at stake becomes reversible error when the penalty is death. Neal v. State, 451 So.2d 743 (Miss. 1984); Laney v. State, 421 So.2d 1216 (Miss. 1982); Irving v. State, 361 So.2d 1360 (Miss. 1978).
We cannot agree with the state's contention that in order to show Smith's motive of jealousy and revenge for killing Carter, it was necessary to introduce the killing of Helen Loper. Nor do we agree that it was necessary to introduce this evidence into the record during the guilt phase to negate Smith's theory of self-defense. No weapon was found on or near Carter's body. Furthermore, Smith admitted he was jealous of Carter and his relationship with Helen Loper.
Smith was convicted of the killing of Helen Loper, which occurred after the death of William Carter. Where defendant is sought to be impeached on grounds of conviction, details of the crime are not admissible, and he cannot be examined as to such details. This Court, in Wells v. State, 288 So.2d 860, 864 (Miss. 1974), citing McElroy's Mississippi Evidence, § 130, pp. 404-405 (1955), stated the rule as follows:
To impeach the credibility of a witness, he maybe asked (1) if he has ever been convicted of a crime, and if his answer is in the affirmative, he may be further asked, (2) what was the crime or misdemeanor, but never is he permitted to be asked any other questions about (the details) of the offense, ... (Emphasis added)
This rule has been consistently upheld. See Gallion v. State, 469 So.2d 1247 (Miss. 1985); Acevedo v. State, 467 So.2d 220, 225-26 (Miss. 1985).
The Court in Tudor v. State, 299 So.2d 682, 685 (Miss. 1974), citing McDonald v. State, 285 So.2d 177 (Miss. 1973), and Coleman v. State, 198 Miss. 519, 23 So.2d 404 (1945), held:
Incompetent evidence, inflammatory in character, when presented to a jury carries with it a presumption that it was harmful. We will reverse a conviction unless it can be said with confidence that the inflammatory material had no harmful effect upon the jury.
The Court stated further in Tudor:
It is error in the course of a trial where one is charged with a criminal offense, for the State to inject extraneous and prejudicial matters and lay them before the jury ... One of the ingredients of a fair and impartial trial is that an accused person should be tried upon the merits of the case. Expressing it another way, the question of guilt or innocence of the crime charged should be received by the jury unhampered by any suggestion or *757 insinuation of any former crime or misconduct that would prejudice jurors ... We commend vigorous prosecutions so long as they are conducted within the rules of evidence. Our adversary system of jurisprudence does not contemplate that attorneys for either side will be completely passive or indifferent during court trials; yet, fundamental fairness requires that any defendant should not be subjected to testimony and tactics which are highly inflammatory and prejudicial as shown by the record before us.
299 So.2d at 685.
Since, in the instant case, it was error to introduce evidence of Helen Loper's killing, Smith was effectively denied his right to a fair and impartial trial.
As above noted, the State contends that the trial court sustained the objection and instructed the jury to disregard the question. Of course, in most cases such an instruction by the trial court would remove any prejudice from the error. Unfortunately, the question in this case carried with it an accusation of such magnitude that its taint could not be removed by any court's admonition, however well intended.
Finding this prejudicial error, we reverse and remand.
AS TO PARTS I, II AND III: WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
AS TO PART IV: ROY NOBLE LEE and HAWKINS, P.J., and DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
WALKER, C.J., and ANDERSON and GRIFFIN, JJ., dissent.
WALKER, Chief Justice, dissenting in part:
I respectfully dissent from the majority's action reversing Grady Smith's conviction and remanding this cause for a new trial.
Smith armed himself and hunted down William Carter with the intent to "kill him or be killed" and then went directly to the home of Helen Roper and killed her. At trial he claimed self-defense.
The majority recognizes that evidence of crimes other than the one for which the accused is being tried is admissible if it falls within one of the recognized exceptions as set forth in their opinion quoting from Blair v. State, 445 So.2d 1373 (Miss. 1984). In the case before us however, the majority ignores the obvious. The fact that Smith killed Helen Loper was essential to prove his motive in killing William Carter as it completely negates Smith's contention that he shot and killed Carter in self-defense. Therefore, this evidence was admissible under this recognized exception to the general rule.
In Neal v. State, 451 So.2d 743 (Miss. 1984), cert. den. 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984) the defendant was on trial for the murder of his niece Amanda Joy. At trial evidence that the defendant had committed the murder of Bobby Neal and the murder of Melanie Sue Polk was introduced. On appeal we upheld the admissibility of evidence of these crimes stating:
One of the accepted exceptions to the general disallowance of evidence of other crimes is where that evidence tends to prove motive. According to defendant's confession, the killing of Bobby Neal preceded in time the killing of Amanda Joy. Quite logically, the State could argue that Neal killed Amanda Joy to be sure that he left no witnesses to his killing of her father, Bobby Neal. (citations omitted)
Beyond that, evidence of defendant's crimes against Bobby Neal and Melanie Sue Polk were admissible because they were integrally related in time, place and fact with the murder of Amanda Joy... . We are concerned here with the State's legitimate interest in telling a rational and coherent story of what happened to Amanda Joy Neal. What happened to Bobby Neal and Melanie Sue Polk is integrally interwined with what happened to Amanda Joy. There was no error in the *758 trial court's allowing this evidence to be presented to the jury.
451 So.2d at 759.
Applying the rationale stated in Neal, I would affirm the conviction and sentence of Grady Smith. In my opinion, the testimony regarding the murder of Helen Loper was admissible as it made the story complete and was evidence that Smith's motive for killing William Carter was not self-defense but rather revenge and jealousy.
The judgment of conviction and jury verdict that Smith be executed should be affirmed.
ANDERSON and GRIFFIN, JJ., join this dissent.
NOTES
[1] The California Courts, however, have not abolished the felony-murder doctrine in toto. The Supreme Court distinguishes those cases where death results from an assault with a death weapon where the purpose of the conduct was the very assault which resulted in death and those cases where death results from conduct for an independent felonious purpose, such as robbery or rape, which are accomplished by a deadly weapon and thus technically includes assault with a deadly weapon. See People v. Burton, 6 Cal.3d 375, 99 Cal.Rptr 1, 491 P.2d 793 (1971).