# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-KA-01450-SCT

*CHANCELLOR CHRISTMAS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/11/2007 |
| TRIAL JUDGE: | HON. BOBBY BURT DELAUGHTER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DONALD W. BOYKIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LA DONNA C. HOLLAND |
| DISTRICT ATTORNEY: | ELEANOR FAYE PETERSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/02/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Chancellor Christmas and three others were indicted for one count of armed robbery pursuant to Mississippi Code Section 97-3-79 (Rev. 2006) and one count of house burglary pursuant to Mississippi Code Section 97-17-23 (Rev. 2006).  The State also sought an enhanced penalty pursuant to Mississippi Code Section 99-19-351 (Rev. 2007), as the victim, Margie Sellers, was over the age of sixty-five years at the time the offenses occurred.  Christmas was tried alone, and the jury found him guilty on both counts and also found that he deserved an enhanced penalty on both convictions.  Christmas was sentenced to serve

ninety years for the armed robbery, to be served consecutively to the fifty-year sentence he received for house burglary. He now appeals these convictions. Finding no error, we affirm.

## Issues

¶2. Christmas appeals the following issues: (1) whether the court erred by allowing identification testimony following a constitutionally impermissible photographic lineup; (2) whether the court erred by limiting cross-examination of a State witness; (3) whether the court erred by allowing the State to conduct an improper redirect examination; (4) whether the jury should have been instructed as to constructive breaking; (5) whether there was sufficient evidence to support the verdict; (6) whether the trial court erred by denying the defendant's peremptory instructions; and (7) whether the trial court erred by denying a juror challenge for cause.

## Facts

¶3. Raymond Echols, one of Christmas's co-defendants, testified that on the morning of July 25, 2006, he, Joseph Harris, Travis Thurman, and Christmas were driving a stolen black Avalanche in and around Edwards, Mississippi.[1] Echols stated that Christmas was driving but was not present when the vehicle was stolen. Echols testified these young men observed "an old white woman at her mailbox," and Christmas initiated a plan to break into this

---

[1]Echols, who was fourteen at the time of these offenses, pled guilty, and received a sentence of twenty years, with fourteen years suspended and six years to serve, in exchange for testimony against Christmas.

woman's house. According to Echols, Christmas exited the vehicle, approached the house, and knocked on the door.

¶4.    Margie Sellers testified that she answered the door to a clean-cut, young, African-American man who asked whether he could go fishing in the pond near her home. She told him it was not her pond and he would have to ask the owner's permission. She stated that the man at her door came from a black truck, with the windows tinted, and she could see "the forms of two others in the truck."

¶5.    The men then left, drove a short distance up the road, and returned to Ms. Sellers's house. Echols testified the men had no intention of going fishing, but planned to rob Sellers. When they returned to her house, Echols testified that only Christmas and Harris went to the door. However, Ms. Sellers testified that when she opened her door a second time, there were three men. Ms. Sellers stated she saw each of their faces, "but as far as taking a good look . . . I did not." According to Sellers, one of the men told her that the owners of the home with the pond were not at home, so she stepped outside her door onto the porch to point the men to another home. Ms. Sellers testified that when she turned to go back inside her home, one of the men

> grabbed me from behind, put a gun to my head and shoved me on in the house, and he was pushing me. And he said, "where's the money? where's the money? I'll kill you." And the other came running through and went down to one end of the trailer while he was pushing me toward the other end. I told him – I said, "what money I have is in my purse on the couch. And just take it and leave."

3

¶6. Ms. Sellers testified she was then shoved by the man onto the floor in a closet. She stated that he told her to stay there and then ran out of the room. Once the men left, Ms. Sellers called 911.

¶7. According to Echols, Christmas was the person who grabbed Ms. Sellers and put the gun to her head. Echols said that Christmas pushed the victim into the house, and Harris followed. Echols testified that when Christmas and Harris came out of the house, Harris was carrying a white purse.

¶8. Meanwhile, the Hinds County Sheriff's Department was tracking the stolen black Avalanche through the vehicle's global positioning system. Deputy Sheriff Andrew McKinley testified that while he was on patrol, he received a call about the location of the stolen car. McKinley testified that around the same the time he first observed the Avalanche, he learned that there had been a house burglary in Edwards and that another unit was responding to that burglary.

¶9. McKinley testified that he and "other units" made contact with the Avalanche, and a chase ensued for "maybe a mile, a mile and half." He stated that after the stolen vehicle almost crashed into a parked car, it stopped and four males exited the vehicle. According to McKinley, two of the males ran to the right and two ran to the left. Echols testified that he and Christmas were the two men who ran to the left, and that Harris and Thurman ran to the right. McKinley pursued the men running to the left, but did not apprehend either.

¶10. McKinley returned to the vehicle, where other officers were stationed. A man who lived in the neighborhood approached the officers, claiming that someone had crawled into

4

a space under his house. The officers went to the house and found Harris hiding in the crawl space.

¶11. Terrell White was also arrested at the scene. White fit the description of one of the males who had fled the car, and when the deputies approached him, White ran. However, according to Deputy Sheriff McKinley, White ran because he was carrying narcotics, not because he was involved in the robbery of Ms. Sellers.

¶12. Hinds County Sheriff's Deputy Mac James testified that he was called to the location of the Avalanche to process the vehicle for fingerprints. James testified that he found Ms. Sellers's coin purse, as well as her insurance card, in the passenger-side floorboard of the Avalanche. James further testified that he found two Nike tennis shoes near the vehicle, although the two shoes were not found together. One shoe was found near the front of a house, and the other shoe was found in the back yard. James opined they were in separate locations because "somebody was possibly running – running out of their shoes."

¶13. The jury also heard testimony from Quincy Ross. Ross shared a home with his mother and stepfather, his siblings, and Christmas. Ross testified that Christmas came home the morning of July 25, 2006, without his shoes and that Christmas told him he had lost his shoes in a chase with police. Ross stated that Christmas told him he had robbed an old white woman in Edwards, and that Christmas had put a gun to the woman's head, forced her into a closet, and asked her where her money was. However, Ross later denied that Christmas said he was the one who held the gun and forced the woman into the closet. Ross further testified that he had known Christmas to carry a "little thirty-eight special" and that

Christmas was carrying a gun the day of this incident. Ross stated that Christmas said he disposed of the gun after the incident. No gun was ever recovered by the authorities. A few weeks after the robbery, Ross and his mother called the police to relay the information Ross had received from Christmas.

¶14. After Christmas was taken into custody, Wesley Reeves, an investigator with the Hinds County Sheriff's Office, took a statement from him. Reeves testified that Christmas admitted being present during the robbery and that he accurately described the color of the purse, the color and model of the car, the victim's house, and the victim's car. Reeves also stated that Christmas described the victim as "an old white lady," and that the gun was a "thirty-two or thirty-eight caliber" revolver.

¶15. Investigator Reeves was also present when Ms. Sellers gave a statement to the deputy sheriffs the day after the robbery. Ms. Sellers was shown a photographic lineup, during which she identified Terrell White "as being the person who attacked and grabbed me." Ms. Sellers testified that she was confused because on the evening of the incident, she saw White's photograph on the news. Reeves testified there were distinct similarities between the pictures of White and Christmas.

¶16. In her statement, Ms. Sellers stated that the person who came to her door was "tall, probably my height or maybe not, you know, not much taller." She then testified that the person who came to her door the first time was "very young" and "smaller in height" than the other defendants. Also during her testimony, Sellers said that she was not sure which person actually grabbed her and did not know whether her attacker was taller than she. The

6

evidence at trial revealed that Echols was the youngest and the smallest of the defendants and that Christmas was the tallest.

¶17. After the prosecution rested, Christmas moved for a directed verdict, without success. The defendant elected not to testify, and called no witnesses. The crux of the defense was that Christmas was present at the time of the robbery, but stayed in the truck and did not participate. His counsel argued that the testimonial inconsistency about the number of people who approached Sellers and their heights supported this defense. Christmas also contended that there was insufficient evidence to prove there was an actual breaking to gain entry to Sellers's home that would meet the requisite standard for house burglary as given in the jury instructions.

¶18. After deliberation, the jury found Christmas guilty of armed robbery and house burglary with penalty enhancement on account of Ms. Sellers's advanced age.

**ANALYSIS**

**I. Photographic Lineup.**

¶19. Forty-three days after the robbery, Reeves and another deputy sheriff questioned Echols about the incident at Ms. Sellers's home. Echols told the deputies that a man named Terrell was the person who had forced the victim into the closet with a gun. Echols stated that the day of the incident was the first time he had met that man and that Harris, another co-defendant, had called the man Terrell. Investigator Reeves testified that when Echols kept referring to Terrell as "the tall one," Reeves believed Echols was actually referring to

7

Christmas. Reeves testified that he then showed Echols one photograph of Christmas, and Echols identified him as the man with the gun.

¶20.    Before Echols was called to testify at trial, Christmas moved to have Echols's identification testimony suppressed. Christmas argued that he should have been allowed to have legal counsel present while Echols was shown the photograph, and that the single image was impermissibly suggestive. The trial court held that Christmas was not entitled to counsel during a photographic lineup and, even if the lineup was impermissibly suggestive, Echols's identification was nonetheless reliable.

**A. Right to Counsel.**

¶21.    Regarding the right to counsel, this Court has held, "[a]n accused does not enjoy the right to counsel during a *photographic* lineup." ***Wilson v. State,*** 574 So. 2d 1324, 1326 (Miss. 1990) (emphasis added). ***Wilson*** also held, "only an actual confrontation with the defendant at a lineup is the critical stage which requires the right to counsel." ***Id.*** at 1326. Moreover, the United States Supreme Court has held that "the Sixth Amendment does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender." ***United States v. Ash***, 413 U.S. 300, 321, 93 S. Ct. 2568, 2579, 37 L. Ed. 2d 619, 633 (1973). Accordingly, Christmas's assertion that his Sixth Amendment right was violated by having no counsel present at a photographic lineup is without merit.

**B. Reliability of Identification.**

8

¶22. As for the reliability of Echols's identification, we first examine whether the photographic lineup was impermissibly suggestive. "[T]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." ***Roche v. State***, 913 So. 2d 306, 310-11 (Miss. 2005) (quoting ***Foster v. California***, 394 U.S. 440, 443, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969)). *See also **Herrera v. Collins***, 904 F.2d 944, 947 n.1 (5th Cir. 1990) ("[T]he showing of a single photograph is an *inherently* suggestive method of identification.") (emphasis added)).

¶23. Furthermore, Echols indicated to the police that Christmas's name was actually Terrell. Notably, a man named Terrell White was apprehended after exiting the stolen black Avalanche and fleeing the scene, and the victim initially identified White as her attacker. There was also testimony that Terrell White resembled Christmas.

¶24. The United States Supreme Court has observed that the "danger [of misidentification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw." ***Simmons v. United States***, 390 U.S. 377, 383, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247, 1253 (1968). Therefore we conclude that the initial identification of Christmas, by means of a single photograph, was "impermissibly suggestive."

¶25. Once it is determined that the identification procedure was impermissibly suggestive, the Court must determine whether the identification was nonetheless reliable. ***Neil v. Biggers,*** 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401, 411 (1972). ***Biggers*** sets

9

forth the test for determining whether identification testimony is reliable despite the substantial likelihood of misidentification. The five *Biggers* factors are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Roche*, 913 So. 2d at 311 (quoting *Biggers*, 409 U.S. at 199-200).

¶26. The trial judge considered four of the factors and found that they weighed in favor of admitting the identification testimony. When a trial court determines that such testimony is reliable under the *Biggers* test, this Court will not reverse unless there is a lack of "substantial credible evidence supporting the trial judge's findings." *Hansen v. State*, 592 So. 2d 114, 138 (Miss. 1991) (quoting *Nicholson v. State*, 523 So. 2d 68, 71 (Miss. 1988)).

¶27. First, the trial judge found that the 43-day lapse between the crime and the identification weighed in favor of the defendant. Then, he determined that Echols had ample opportunity to view the accused and that he was sufficiently attentive because, according to Echols's testimony, he was in close proximity to the defendant for roughly three hours. Finally, the trial judge determined that Echols's prior description that Christmas was "the tall one" was accurate and weighed in favor of the State.

¶28. We find that there was "substantial credible evidence" to support the trial court's order denying Christmas's motion to suppress the identification. *Id.* Based on Echols's testimony, he was within only a few feet of the defendant for a significant period of time.

10

These facts support the trial court's finding that Echols had ample opportunity to view the defendant. While there was no testimony directly related to Echols's degree of attention, we cannot say that the trial judge erred in considering the foregoing facts to find that Echols was sufficiently attentive. Additionally, although the judge did not address the level of certainty, the testimony does indicate that Echols did not hesitate when identifying Christmas.

¶29. We disagree, however, with the trial judge's determination that Echols's description was accurate. Even though Christmas was tall, this very limited description is undeniably vague. *Compare **Biggers***, 409 U.S. at 200 ("[The victim's] description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough."). Nevertheless, in light of the other factors, the trial judge did not err in allowing the identification testimony despite the suggestive nature of the single photograph. Accordingly, this issue is without merit.

**II. Deputy Sheriff Reeves's Testimony.**

¶30. "The relevancy and admissibility of evidence are largely within the discretion of the trial court and this Court should only reverse where it is clear that discretion has been abused." ***Simmons v. State***, 805 So. 2d 452, 487-488 (Miss. 2001) (citing ***Burns v. State,*** 729 So. 2d 203, 218 (Miss. 1998)). "If the trial court applied an improper legal standard, resulting in prejudice to the accused, then a reversal is warranted." ***Ford v. State***, 975 So. 2d 859, 865 (Miss. 2008) (citing ***Peterson v. State***, 671 So. 2d 647, 656 (Miss. 1996)).

**A. Cross-examination of Deputy Sheriff Reeves.**

¶31. Christmas argues that the trial court erred by not allowing his attorney to question Reeves about his statements to law enforcement authorities. During direct examination, Reeves was asked whether Christmas had admitted being present during the robbery, and Reeves responded "he did." On cross-examination, defense counsel asked Reeves whether Christmas had stated that he participated in the crimes against Ms. Sellers. Before Reeves could answer, the State objected, citing hearsay. The trial court sustained the objection, and defense counsel did not rephrase the question or attempt to proffer the expected testimony.

¶32. It is well recognized that "a trial court will not be reversed for limiting cross-examination where 'no proffer was made of the testimony nor was a statement dictated into the record to indicate what was proposed to be shown by the examination.'" ***Blocker v. State***, 809 So. 2d 640, 646 (Miss. 2002) (quoting ***McGee v. State***, 365 So. 2d 302, 304 (Miss. 1978)). Because the defense attorney failed to proffer the officer's expected testimony, this Court cannot assume that the evidence would have supported Christmas's defense. Thus, this issue is without merit.

**B. Redirect Examination of Deputy Sheriff Reeves.**

¶33. Christmas also argues that the trial court erred by refusing to limit the State's redirect examination of Reeves. During redirect, Reeves testified to various statements made by Christmas that were not brought out on direct or cross-examination. Reeves testified that Christmas described the victim as "an old white lady," that he "knew about a black

12

Avalanche," that he accurately described the stolen purse as white, and that he described the gun as a "thirty-two or thirty-eight" caliber revolver. Eventually, the defense lawyer objected to this line of questioning:

| | |
|---|---|
| **Prosecutor:** | And did you ask [Christmas] if – he admitted he ran – he ran out – |
| **Defense Attorney:** | I'm going to object. It is improper redirect. |
| **Court:** | Why? |
| **Defense Attorney:** | Well, for one, he's not clarifying anything that I went into on cross. |
| **Court:** | In Mississippi, you're not limited on what's called into cross. . . . |
| **Defense Attorney:** | My argument is that he is going into new ground here, and that he's not going into ground that was to clarify anything that may have been – come up as a result of my cross-examination. . . . |
| **Court:** | Okay. Alright. That is not the rule in Mississippi. It's overruled. |

¶34. After this exchange, the prosecutor abandoned the question but elicited additional testimony that Christmas accurately described the victim's house and her car. Later in the redirect examination, Reeves was asked by counsel for the State, "[a]nd the defendant didn't deny running out of his shoes to get away from the police?" Deputy Sheriff Reeves responded, "No, he did not."

13

¶35. While a trial judge enjoys broad discretion in allowing or excluding testimony on redirect examination, we find that in this instance the trial court erred in ruling that redirect examination is not limited to matters first brought out in cross-examination. The applicable rule for redirect examination in Mississippi is quite clear: "The scope of redirect examination, while largely within the discretion of the trial court, is limited to matters brought out during cross-examination." *Conley v. State*, 790 So. 2d 773, 786 (Miss. 2001) (quoting *Blue v. State*, 674 So. 2d 1184, 1212 (Miss. 1996)). *See also West v. State*, 463 So. 2d 1048, 1055 (Miss. 1985) ("The general rule is that redirect is limited to matters brought out on cross-examination.") (citing *Cole v. Tullos*, 228 Miss. 815, 90 So. 2d 32 (1956)).

¶36. However, Christmas's attorney did not object to the examination until most of the improper testimony had been presented. This Court has held that "[t]o preserve an issue for appeal, a contemporaneous objection must be made." *Walker v. State*, 913 So. 2d 198, 238 (Miss. 2005). Therefore, although the trial judge erred in allowing unfettered redirect, we cannot find that this constitutes reversible error.

**III. Jury Instructions.**

¶37. Christmas argues that the jury should have been instructed on the definition of "constructive breaking." When instructing the jury as to the elements of house burglary, the trial court gave the following instructions, in pertinent part:

> **Instruction S-1:** [I]f you unanimously find from the evidence in this case, beyond a reasonable doubt, that the defendant, Chancellor Christmas,

14

individually or while aiding and abetting or acting in concert with another . . . did:

1. willfully, unlawfully, and feloniously break and enter the dwelling house of Margie Sellers;

2. with the intent to commit a crime therein, to-wit: armed robbery, as defined in other instructions of the Court. . . .

**Instruction S-2:** The court instructs the jury that the words "break," "broke" and/or "breaking" as used in these instructions refer to any unauthorized act of force, regardless of how slight, necessary to be used in entering a building, such as turning a knob or opening or pushing a door or window.

¶38. When describing how the defendants entered her home, Ms. Sellers testified she did not give the defendants permission to enter the house, and "[w]hen I opened the door, that's when he grabbed me from behind, put a gun to my head, shoved me on in the house, and he was pushing me."

¶39. Christmas submits that the entry method does not comport with the trial court's instructions regarding "breaking." Christmas argues the jury should have been instructed respecting constructive breaking or that the trial judge should have issued Christmas's proffered peremptory instruction which read, "The court instructs the jury to find the Defendant, Chancellor Christmas, not guilty of Count II, house burglary." The State counters that the elements of breaking and entering were met, as "placing a gun to someone's head and shoving them into the front door of their home is certainly an act of force employed to effect entrance."

¶40.    In ***Smith v. State,*** this Court quoted with approval the North Carolina Supreme Court in refining our definitions of actual and constructive breaking:

> In ***State v. Jolly***, 297 N.C. 121, 254 S.E.2d 1 (1979), the defendant was convicted of first degree burglary and armed robbery and appealed to the Supreme Court of North Carolina. The court defined breaking as ". . . any act or force, however, slight, 'employed to effect an entrance through any usual or unusual place of ingress, whether open, partly open, or closed.'" The court noted that a breaking could be actual or constructive and defined a constructive breaking as one which occurs when entrance is obtained in consequence of violence commenced or threatened by defendant. The evidence in Jolly showed the defendant gained entry into the victim's motel room by pushing the victim into the room as he opened the door, constituting a constructive breaking.

***Smith v. State***, 499 So. 2d 750, 752-753 (Miss. 1986).  By holding a gun to Ms. Sellers's head and forcing her into the home, Christmas met Mississippi's established standard for constructive breaking, which this Court has held satisfies the "breaking" element of burglary. *See **Templeton v. State,*** 725 So. 2d 764, 766 (Miss. 1998).  While the jury was not issued an instruction on the specific definition of "constructive breaking," it was issued an instruction on the constituent elements of burglary.  This Court has held that "instructions in a criminal case which follow the language of a pertinent statute are sufficient." ***Rubenstein v. State,*** 941 So. 2d 735, 772 (Miss. 2006) (citations omitted).  We find that the jury received adequate instructions regarding this offense.

**IV. Sufficiency of the Evidence.**

¶41.    Christmas argues that the trial court erred in denying his motion for a judgment notwithstanding the verdict. A motion for a judgment notwithstanding the verdict challenges

16

the sufficiency of the evidence. ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005). When reviewing a case for sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Id.*** (quoting ***Jackson v. Virginia***, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

¶42.     Christmas asserts that the conflict between Echols's testimony and Ms. Sellers's testimony was sufficient for the trial judge to grant his motion for judgment notwithstanding the verdict.  Christmas reiterates the testimony of Sellers to the effect that her attacker could have been her height and not much taller, comparing it to Echols's testimony that Christmas is the tallest of the defendants.  Christmas also points to Ms. Sellers's identification of Terrell White as her attacker.  Additionally, Christmas asserts that the only portion of Echols's testimony that was corroborated was Christmas's admission to Deputy Sheriff Reeves that he was present at the scene of the robbery.

¶43.     While it is correct that Ms. Sellers and Echols offered conflicting testimony, it is not up to this Court to resolve such a conflict.  That is the jury's function.

> Jurors are permitted, and indeed have the duty to resolve the conflicts in the testimony they hear. Any conflicts in the testimony of witnesses is the province of the jury. Who the jury believes and what conclusions it reaches are solely for its determination. As the reviewing court, we cannot and need not determine with exactitude which witness(es) or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.

***Stephens v. State***, 911 So. 2d 424, 436 (Miss. 2005) (internal citations omitted).

¶44. Along with the testimony of Ms. Sellers and Echols, the jury also was presented with the testimony of multiple sheriff's deputies, forensic analysts, and with that of Quincy Ross, who stated that Christmas admitted to him his involvement in the crimes. After hearing all the evidence and being adequately instructed on the applicable law, the jury rendered its decision in due course. We find that "any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *Bush,* 895 So. 2d at 843.

**V. Peremptory Instructions.**

¶45. Christmas argues that the trial court erred in "denying his peremptory instruction concerning counts I and II." Christmas presents no argument in support of this assertion. "If an appellant fails to support her [or his] allegation of error with argument or authority, this Court need not consider the issue." *Pierre v. State*, 607 So. 2d 43, 48 (Miss. 1992) (citations omitted).

**VI. Juror Challenge.**

¶46. Finally, Christmas argues that the trial court erred by denying his challenge for cause against juror Shaun Chunn based on comments she made during voir dire examination. The State counters that we need not address the merits of this claim because Chunn did not sit on the jury and Christmas had not exhausted all of his peremptory challenges.

¶47. The State is correct on this point. This Court has held,

> So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the defendant was denied his constitutional rights. *Ross v. Oklahoma*, 487 U.S. 81, 88, 108

18

S. Ct. 2273, 2278, 101 L. Ed. 2d 80, 90 (1988). This Court has explained that a prerequisite to presentation of a claim of a denial of constitutional rights due to denial of a challenge for cause is a showing that the defendant had exhausted all of his peremptory challenges and that the incompetent juror was forced by the trial court's erroneous ruling to sit on the jury. *Chisolm v. State*, 529 So. 2d 635, 639 (Miss. 1988).

*Mettetal v. State*, 615 So. 2d 600, 603 (Miss. 1993). In this case, Christmas only used eleven of his twelve available peremptory strikes. Therefore, we do not reach the question of whether the trial court erred in denying his challenge for cause.

## CONCLUSION

¶48. We find no reversible error and affirm Christmas's convictions and sentences.

**¶49. COUNT I: CONVICTION OF ARMED ROBBERY AND SENTENCE OF NINETY (90) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF HOUSE BURGLARY AND SENTENCE OF FIFTY (50) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT II TO BE SERVED CONSECUTIVELY TO THE SENTENCE IN COUNT I.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, RANDOLPH, LAMAR, CHANDLER, AND PIERCE JJ., CONCUR.**