# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-01318-SCT

*ERIC TATE*

**v.**

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/21/2008 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SANFORD E. KNOTT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | RONNIE LEE HARPER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/29/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLSON, P.J., DICKINSON AND PIERCE, JJ.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Eric Tate was convicted of one count of sexual battery and two counts of child fondling, with the acts having been committed when his female victim was nine years and ten years of age. The trial judge sentenced Tate to thirty years imprisonment on the sexual-battery conviction and ten years imprisonment on each of the child-fondling convictions, to run consecutively.  From the Amite County Circuit Court judgment of conviction and sentence, Tate appeals to us.  Finding no reversible error, we affirm.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.	Eric and Curtileniea Tate were married in 2001, and from that union, two children were born. Curtileniea brought to this marriage her child Brittany,[1] who was born August 14, 1996. However, Brittany had lived with her maternal grandparents, Rosie and Curtis Holloway, since shortly after her birth. Eric, Curtileniea, and their two sons lived approximately one mile from the Holloways and Brittany in rural Amite County, and Brittany visited in the Tate home on a regular basis, sometimes spending the night on weekends. Eric Tate was employed by Sonoco Catering Company as an executive steward (galley cook), working on offshore rigs. Throughout his marriage to Curtileniea, Tate's work schedule required that he work offshore for two weeks at a time, with one week off at home in Amite County.

¶3.	During May or June of 2007, Rosie Holloway became suspicious about Tate and Brittany because Tate was constantly phoning, wanting to talk with Brittany. Normally, these calls were made while Tate was either on the job or traveling to work. On a Tuesday in late July 2007, during one of these many phone conversations between Tate and Brittany, Holloway, unbeknownst to Brittany, was standing so close behind Brittany that Holloway could hear what Tate was saying to Brittany over the phone. Holloway heard Tate tell Brittany "what to wear, and [Brittany] told him she wouldn't wear those kind of clothes anymore." Holloway grabbed the phone from Brittany and hung up the phone as Brittany ran into the bathroom. Holloway followed Brittany into the bathroom and asked her if Tate

---

[1]This is a pseudonym. Since Brittany is the victim in this case, we will protect her true identity due to the nature of this case.

"was touching her," and Brittany began crying. Brittany finally admitted to Holloway that Tate had been touching her, and Brittany further stated "but I am not doing anything. I promise. I am not doing anything but he's touching me." At this point, Holloway called Tate back on the phone and asked Tate if he was touching Brittany. Tate, who called his mother-in-law "Ma," kept saying, "Ma, Ma . . . Ma, Ma." Holloway in turn said to Tate "you're a dirty dog," and hung up the phone.

¶4.    On the same day, Holloway got in touch with Curtileniea and informed her of Brittany's disclosure. When Curtileniea confronted Tate about what her mother had told her, Tate "denied doing anything to [Brittany]." On Friday after the Tuesday phone call, Holloway, Curtileniea, and Brittany traveled to the Amite County Sheriff's Department and talked with Deputy Sheriff William P. Vallely, who had more than thirty years experience in law enforcement.[2] Curtileniea informed Deputy Vallely that Tate was molesting Brittany. Initially, Brittany was kept in another room while Curtileniea, with Holloway present, informed Deputy Vallely of Brittany's accusations.[3] Vallely eventually brought Brittany into the room and talked with her briefly in the presence of Curtileniea and Holloway. During this conversation, Brittany, at Deputy Vallely's request, wrote out a statement in her own

---

[2]Deputy Vallely had retired as Chief Deputy of the Amite County Sheriff's Department in 2004, but continued to work on a part-time basis after his retirement.

[3]Curtileniea testified during the defendant's case-in-chief that it was her mother, Rosie Holloway, who did all the talking with Deputy Vallely, and that she (Curtileniea) did not say anything because she did not believe Brittany's allegations, and that Brittany "had confided in my mother about this, not me."

3

handwriting, describing what had happened between her and Tate. The statement, which was offered into evidence as Exhibit 3 in Tate's trial, described, in the words of a ten-year-old girl, acts by Tate involving vaginal penetration of Brittany with his penis and Tate's forcing Brittany to touch his penis. In this statement, Brittany also wrote about Tate's phone call which Holloway had overheard. Brittany likewise included in her statement the fact that after her mother, Curtileniea, learned of Brittany's accusations, Curtileniea sided with her, as opposed to Tate, and told Tate to get out of the house. Brittany signed this statement, and Curtileniea likewise signed the statement.

¶5. At the conclusion of this meeting, Deputy Vallely contacted the Amite County office of the Mississippi Department of Human Services (MDHS), which sent two case workers to interview Brittany. After this interview, Curtileniea signed a criminal affidavit charging Tate with "Molesting: 97-5-23."[4] MDHS referred Brittany to Dr. Leigh Gray, a physician specializing in obstetrics and gynecology in Brookhaven. On August 9, 2007, Dr. Gray saw Brittany, took a history from her, and conducted a pelvic examination.[5] Dr. Gray's

---

[4]This is the child-fondling statute. The affidavit Curtileniea signed charged, *inter alia*, that Tate "did willfully, unlawfully and feloniously, being a person above the age of eighteen (18) years, for the purpose of gratifying his lust or indulging his depraved, licentious sexual desires, handle, touch and rub with his hands [Brittany] a child under sixteen (16) years of age . . . ." *See* Miss. Code Ann. § 97-5-23 (Rev. 2006).

[5]Dr. Gray actually first saw Brittany on August 3, 2007, but because Brittany was "uncomfortable" with the pelvic examination, the office visit was rescheduled for August 9, so that Brittany could then "be put to sleep so she wouldn't be so uncomfortable with the exam."

4

examination of Brittany revealed "tears in her hymen which were consistent with evidence of trauma."

¶6.     Eric Tate was indicted by the Amite County Grand Jury for one count of sexual battery and two counts of child fondling. On May 20 and 21, 2008, Tate was tried before a jury on all three counts of the indictment in the Circuit Court of Amite County, Judge Forrest A. Johnson, Jr., presiding. Testifying for the State were Brittany, Dr. Gray, Deputy Vallely, and Rosie Holloway. Testifying on behalf of Tate were Curtileniea Tate and Megan Grant.[6]

¶7.     During the trial, in addition to the facts thus far depicted, Brittany testified that Tate had begun touching her when she was seven or eight years old. According to Brittany, on numerous occasions for more than one year, Tate had touched her on her breasts and in her vaginal area. On several occasions, Tate also had inserted "a little green wiggle thing" into her vagina. This item, which was described as resembling a writing pen, but in essence being a vibrator, was discovered by Holloway and Curtileniea in their search of Tate's room after the molestation charges surfaced. Holloway and Curtileniea also discovered a pornographic video in Tate's room, but the trial judge excluded the video from evidence. Brittany likewise testified that on at least one occasion, Tate had tried to put his "private part" inside her, but "it wouldn't fit." After Tate tried to penetrate Brittany's vagina with his penis, he had called Brittany to the bathroom, where Tate had unbuttoned his boxer shorts, exposed his penis to Brittany and told her that the white excretion on his penis was "cum stuff." Brittany

_____

[6]Likewise, as with Brittany, this is a pseudonym. Megan was a high-school student at the time of trial.

5

explained her failure to tell her mother about Tate's abuse of her by stating that she was afraid of Tate and felt that her mother would not believe her. In the end, Brittany's opinion that her mother would not believe her if she told her about Tate's physical abuse of her turned out to be prophetic.

¶8. By the time of Tate's trial, Curtileniea had abandoned her daughter and returned to Tate. Curtileniea testified that when the abuse charges had first surfaced, she had to make a choice, and she chose to believe Brittany and to press charges because Curtileniea's mother, Rosie Holloway, was a strong-willed woman who always wanted to "control everything and have her way." Curtileniea offered at least two reasons why Brittany would attempt to "frame" Tate with false charges of sexual abuse. First, according to Curtileniea, Tate and Curtileniea had tried to discipline Brittany, and neither Brittany nor Holloway had approved of their efforts. Likewise, Curtileniea stated that one day she had discovered $100 missing from her purse and when she asked Brittany about the missing $100, Brittany stated, "I don't have it. Eric may have it." When Curtileniea had confronted Tate about the missing cash, he had denied having it. Eventually, according to Curtileniea, Holloway had called and said that Brittany had the $100. Curtileniea opined that this incident would be another reason why Brittany might attempt to frame Tate for something he did not do. Finally, Megan Grant, a witness for Tate, testified that Brittany had falsely accused Tate of molesting her (Megan), and Megan denied that Tate had ever molested her. Thus, according to the defense theory, if Brittany would falsely accuse Tate of molesting Megan Grant, then Brittany was capable also of falsely accusing Tate of molesting her (Brittany).

6

¶9. At trial, the jury found Tate guilty on all three counts in the indictment. Judge Johnson sentenced Tate to terms of imprisonment of thirty years on the sexual-battery conviction and ten years on each of the two child-fondling convictions, with the sentences to run consecutively. On July 29, 2008, the trial court entered an order denying Tate's motion for judgment notwithstanding the verdict or, alternatively, for new trial, and Tate timely appealed to us.

## DISCUSSION

¶10. Eric Tate assigns five errors which he states were committed by the trial court during the course of his trial, and couches them as follows: (1) Whether the trial court erred by not granting a mistrial when the prosecution commented on Tate's right not to testify; (2) whether the trial court erred by permitting prejudicial evidence to show "consciousness of guilt;" (3) whether the trial court's failure to examine individual jurors or grant a mistrial was error when the jury panel was exposed to prejudicial information; (4) whether the evidence "was not legally sufficient" to support the verdict; and (5) whether the trial court erred in denying Tate's motion for a new trial, given that the overwhelming weight of the evidence favored Tate. We restate and combine these assignments of error for the sake of today's discussion.

    **I.    WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A MISTRIAL AFTER THE PROSECUTOR COMMENTED ON THE DEFENDANT'S RIGHT NOT TO TESTIFY.**

¶11. Tate did not testify in this case. Therefore, the trial court instructed the jury in writing via Jury Instruction D-6 (Instruction No. 5), that the defendant had a constitutional right to not testify, that the jury could not draw any inference from the defendant's failure to testify, and that the fact that the defendant did not testify should not in any way be considered by the jury during the course of its deliberations.

¶12. An assistant district attorney conducted the first part of the State's closing argument. After the defendant's closing argument, the district attorney conducted the final (rebuttal) portion of the State's closing argument. Early in his closing argument, the district attorney argued to the jury that, because of the private nature of child sexual abuse, quite often it will be "her word against his." After two defense objections and two bench conferences, the trial judge sustained the defense objection and, *sua sponte*, instructed the jury to disregard the district attorney's comments. Tate asserts that, notwithstanding the trial court's sustaining his objection to the prosecutor's comments and informing the jury to disregard the comments, the prosecutor was guilty of impermissibly commenting on his failure to take the witness stand in his own defense in violation of his right to remain silent as guaranteed under the Fifth Amendment to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution of 1890. Thus, Tate asserts that the trial court's failure to grant his motion for a mistrial was reversible error.

¶13. This Court's standard of review on appeal in determining whether the trial court erred in denying a motion for mistrial is abuse of discretion. ***Dora v. State***, 986 So. 2d 917, 921 (Miss. 2008) (citing ***Pulphus v. State***, 782 So. 2d 1220, 1222 (Miss. 2001)).

8

¶14.    In considering issues regarding alleged improper opening statements and/or closing

arguments by attorneys, we recently stated:

> Attorneys are allowed a wide latitude in arguing their cases to the jury.
> However, prosecutors are not permitted to use tactics which are inflammatory,
> highly prejudicial, or reasonably calculated to unduly influence the jury. **_Hiter_**
> **_v. State_**, 660 So. 2d 961, 966 (Miss. 1995). The standard of review that
> appellate courts must apply to lawyer misconduct during opening statements
> or closing arguments is whether the _natural and probable effect_ of the
> _improper argument_ is to _create unjust prejudice against the accused_ so as _to_
> _result in a decision influenced by the prejudice so created_. **_Ormond v. State_**,
> 599 So. 2d 951, 961 (Miss. 1992).

**_Dora_**, 986 So. 2d at 921 (quoting **_Sheppard v. State_**, 777 So. 2d 659, 661 (Miss. 2000))

(emphasis in original).

¶15.    In **_Dora_**, the defendant was convicted of possession of more than thirty grams of

cocaine and was sentenced as a drug recidivist and a habitual offender to serve a term of sixty

years imprisonment without parole. **_Dora_**, 986 So. 2d at 918.  During the State's rebuttal

portion of closing arguments, the prosecutor stated:

> You also heard the fact that it is undisputed, [l]adies and [g]entlemen, that this
> defendant told Rebecca Dora, I will give you $5,000; I'm sorry I got you into
> this trouble, but I will give you $5,000 to go in there and take the rap for me.
> That is also undisputed.  Nobody came forward said that didn't happen.  I
> submit to you, [l]adies and [g]entlemen, that that is strong evidence that –

**_Id._** at 920.[7]  On appeal, the Court of Appeals found that these statements constituted an

improper comment on the defendant's failure to testify and that the trial court had abused its

---

[7]Although the defendant's aunt, Rebecca Dora, initially had claimed responsibility
for all the drugs found in her home, during the trial, Rebecca testified that the defendant had
offered her $5,000 to "take the rap." **_Dora_**, 986 So. 2d at 919.

discretion in denying the defendant's objection and motion for a mistrial. *Id. See also **Dora***

***v. State***, 986 So. 2d 965, 969-70 (Miss. Ct. App. 2007). We granted certiorari and reversed

the judgment of the Court of Appeals and reinstated and affirmed the circuit court's judgment

of conviction and sentence. ***Dora***, 986 So. 2d at 918.

¶16.    A prosecutor's comments, whether proper or improper, are in response to comments

made by defense counsel in closing arguments. Such was the case in ***Dora***, when defense

counsel, during closing arguments,  stated to the jury that "our theory of the case . . . is that

[Rebecca] stood to go to prison, and that they did not want to see Rebecca go to prison. So

they put it on my innocent client, [Dora], who has the presumption of innocence before you,

the jury." ***Id.*** at 923 n.12.  These statements by defense counsel prompted the prosecutor to

respond in closing arguments that it was undisputed that the defendant had offered Rebecca

$5,000 to "take the rap." In addressing this issue, this Court stated:

> "*There is a difference . . . between a comment on the defendant's failure to testify and a comment on the defendant's failure to put on a successful defense.*" [***Jimpson v. State***, 532 So. 2d 985, 991 (Miss. 1988)] (emphasis in original). The state is entitled to comment on the lack of *any* defense, and such comment will not be construed as a reference to the defendant's failure to testify by innuendo and insinuation.  ***Shook v. State***, 552 So. 2d 841, 851 (Miss. 1989) (emphasis added).  The question is whether the prosecutor's statement can be construed as commenting upon the failure of the defendant to take the stand. ***Ladner v. State***, 584 So. 2d 743, 754 (Miss. 1991).

***Id.*** at 923 (quoting ***Wright v. State***, 958 So. 2d 158, 161 (Miss. 2007)) (emphasis added). In

finding no abuse of discretion in the trial court's denial of the defendant's motion for a

mistrial, we stated "that the prosecutor's statement was a permissible comment on the

absence of evidence to support [the defendant's] defense," as opposed to a veiled attempt by

the prosecutor to point out to the jury that the defendant had not taken the witness stand. ***Dora***, 986 So. 2d at 923.

¶17.    Here, as in ***Dora***, during the State's rebuttal, the district attorney was responding to comments made by defense counsel during closing arguments.  Tate's theory was that Brittany could not be believed. Curtileniea testified that Brittany did not like to be disciplined by Tate, that Brittany may have felt she had been wrongly accused by her mother of taking $100 from her mother's purse, and that Brittany may have been upset because Curtileniea had believed Tate's denial of taking the money over her denial of taking the money.  Thus, for one or both of these reasons, Curtileniea believed Brittany was falsely accusing Tate of these sexual improprieties.  Likewise, the defense offered the testimony of young Megan Grant, who stated that Brittany had falsely accused Tate of sexually abusing her (Megan), a claim which Megan denied.

¶18.    During closing arguments, defense counsel referred to Brittany as "a problem child." Defense counsel talked to the jury about the problems which arise when parents are not able to discipline a child for that child's misconduct, and when a child "starts taking from her natural mother." Defense counsel argued to the jury that problems arise with a child when that child "feels like her mother does not love her," and that child "does not approve of the mother's husband, and thinks that the stepfather is treating her differently." Defense counsel accused Brittany of not telling the truth and stated that there were too many inconsistencies in her stories. Defense counsel reminded the jury that Brittany had stated the sexual abuse by Tate continued over a long period of time, but she had never told her mother about what

11

Tate was doing to her because she had felt that her mother would not believe her. According to defense counsel, the reason that Brittany did not think her mother would believe her was because she had lied to her mother before. Likewise, defense counsel reminded the jury that Brittany did not tell Dr. Gray about Tate inserting the vibrator into her on several occasions, thus, Brittany's testimony about the vibrator was not believable. Additionally, defense counsel argued that "[t]he charges were filed by the mother, [b]ut when she began to think about and review this carefully in her mind, she realized this did not occur." Finally, defense counsel told the jury that "[w]hen you're charged with something you did not do, that person, whether it's me, you or anyone, becomes the victim in this case. Eric Tate, the executive steward of Sonoco, is the victim in this case."

¶19. When the district attorney stood to address the jury in the rebuttal portion of the State's closing arguments, the jury had before it not only these comments by defense counsel, but also the testimony of Curtileniea Tate. During the defendant's case in chief, Curtileniea had testified on direct examination that Tate had denied "doing anything to [Brittany]." The district attorney began his closing arguments:

> Ladies and gentlemen, let me make one thing crystal clear to you before I say anything else. If every one of you go back in that jury room when we get through and vote not guilty, I will go home tonight and sleep like a baby. There's absolutely no way on what he's talking about this case was going to go to trial on these facts. All this business about if they'd have known this or if they had done that, this case was going to trial on these facts. I hate these cases. I hate them. I've been doing this for twenty years, and I hate these cases worse than anything else I do, and I'm going to tell you why, ladies and gentlemen. Because when people do this kind of stuff to children, they don't do it in front of anybody. They don't do it in front of other people. So what I end up with when it really gets down to it is her word against his. Think

12

about it. They're not going to do it in front of the sheriff. They're not going to do it in front of their preacher. They're not even going to do it in front of their wife. Folks, if I want to eat some chocolate in my house and my wife don't want me to, I can promise you, I am eating the chocolate. Okay. It can be done –

At this point, defense counsel objected, and after a nonrecorded bench conference, the judge announced, "Let's go ahead and proceed." The district attorney continued:

So when you have a case like this, ladies and gentlemen – and don't get me wrong. [Defense counsel] is a very, very talented lawyer. He's done a good job, and he's done what he's supposed to do here today, and that's to try to defend his client to the best of his ability, but what happens in this (sic) cases is you've got to make the child the bad person. That's the only way it works. It's her word against his, and as he says –

Again, defense counsel objected and this time the trial judge sustained the objection. After another nonrecorded bench conference, the trial judge informed the jury that he was sustaining the objection and that the jury was "to disregard that last argument and remark of the prosecutor."

¶20. While we respect and appreciate the caution exercised by the trial judge in sustaining defense counsel's objection and *sua sponte* instructing the jury to disregard the district attorney's statements, it is apparent from the record that the district attorney's statements were not impermissible comments calculated to improperly call the jurors' attention to the fact that Tate had failed to testify in his own behalf. Instead, the comments were offered in an effort to counter Tate's efforts at a defense. *Dora*, 986 So. 2d at 923. It is likewise apparent from the record that the prosecutor was properly responding to defense counsel's closing arguments regarding the defense theory that Tate "did not do it" and that Brittany was

13

lying. We also are mindful that Curtileniea testified that Tate had "denied doing anything" to Brittany. Thus, from the totality of the record before us, the district attorney was justified in responding to defense counsel's comments during closing arguments. Consistent with *Dora*, we find that these comments were not improper. *Dora*, 986 So. 2d at 923. *See also United States v. Robinson*, 485 U.S. 25, 34, 108 S. Ct. 864, 99 L. Ed. 2d 23 (1988).

¶21. However, since the trial judge sustained defense counsel's objections to these comments by the district attorney and instructed the jury to disregard them, any conceivable resulting prejudice was cured by this remedial action. "Juries are presumed to follow the instructions given to them by the court." *Walton v. State*, 998 So. 2d 971, 977 (Miss. 2008) (citing *Wheeler v. State*, 826 So. 2d 731, 740 (Miss. 2002)). In the end, the learned trial judge erred on the side of caution. This Court is entitled to presume that the jury followed the trial court's instructions and did not, during the course of its deliberations on the verdict, consider the "her-word-against-his" argument made by the prosecutor. But more importantly, for the reasons we have discussed, the district attorney's comments were not improper, and had the trial judge overruled defense counsel's objection, the trial judge would not have committed error. Thus, unquestionably, the trial judge did not abuse his discretion in denying defense counsel's motion for a mistrial.

¶22. For the reasons stated, we find this assignment of error to be without merit.

**II. WHETHER THE TRIAL COURT ERRED BY PERMITTING PREJUDICIAL EVIDENCE TO SHOW "CONSCIOUSNESS OF GUILT."**

14

¶23. Tate points to two instances during the course of the trial when he alleges the State improperly interjected into the proceedings that Tate had contemplated suicide, thus improperly showing "consciousness of guilt." This assignment of error obviously calls into question the propriety of the trial judge's admission of certain evidence. We repeatedly have stated that when this Court is called upon to review on appeal a trial judge's ruling on evidence, we will review "the trial court's admissibility of evidence under the abuse-of-discretion standard." *Turner v. State*, 3 So. 3d 742, 744 (Miss. 2009) (citing *Ellis v. State*, 934 So. 2d 1000, 1004 (Miss. 2006)). Thus, as we consider whether the trial judge in today's case abused his discretion in allowing this evidence, "[u]nless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case, we will affirm the trial court's ruling." *Jones v. State*, 918 So. 2d 1220, 1223 (Miss. 2005) (citing *McGowen v. State*, 859 So. 2d 320, 328 (Miss. 2003)).

### A. *Deputy Vallely's Testimony.*

¶24. In addressing this assignment of error, we first focus on the testimony of Deputy Vallely. During the direct examination by the district attorney, Deputy Vallely testified about meetings with Curtileniea, Holloway, and Brittany. Deputy Vallely likewise informed the jury about contacting the MDHS in Amite County, with MDHS sending over two case workers to interview Brittany, followed by Curtileniea signing the criminal affidavit charging Tate with child molestation. The district attorney then questioned Deputy Vallely about his actions to have a warrant issued and served on Tate based on the criminal affidavit signed

15

by Curtileniea. Deputy Vallely stated that at the time of the issuance of the warrant, Tate was working offshore. From Curtileniea, Deputy Vallely learned that when Tate returned from the offshore rig, he would come ashore at New Iberia, Louisiana; therefore, Vallely contacted the New Iberia Police Department. The following exchange occurred at trial:

Q. What, if anything, did you do – what action did you take? I believe you said you called New Iberia. You talked with them. What did you do after that?

BY [DEFENSE COUNSEL]: I would object based upon relevancy.

BY THE COURT: I will overrule at this point, but let's cover this and move on.

BY [DISTRICT ATTORNEY]: Yes, sir. I am trying to get there, Judge.

BY THE WITNESS: I notified New Iberia to be on the lookout for him and for his vehicle because of possible suicide.

BY [DEFENSE COUNSEL]: Your Honor, I object to that.

BY [DISTRICT ATTORNEY]: I am not trying to solicit that, Your Honor.

BY THE COURT: I'll sustain. I'll sustain the objection to that. Ladies and gentlemen, you're to disregard that last statement. Now, apparently he was arrested. Let's move on to a different subject.

BY [DISTRICT ATTORNEY]: Yes, sir.

The district attorney then proceeded to ask Deputy Vallely about the details of the arrest and the initial appearance in justice court, to which defense counsel objected as to relevancy, and the trial judge sustained the objection, reasoning that "[i]t's been established he was

16

arrested." In response to the district attorney's final question, Deputy Vallely stated he had no further involvement in the investigation of Tate's case, and Vallely was thus tendered for cross-examination by defense counsel.

¶25.    Deputy Vallely unquestionably testified that he had informed personnel at the New Iberia Police Department "to be on the lookout for [Tate] and for his vehicle because of possible suicide." Once defense counsel objected, the district attorney informed the trial court that this was not the response he was attempting to elicit. The trial judge sustained defense counsel's objection and promptly admonished the jury, *sua sponte*, to disregard the last response by the witness.  The trial judge likewise admonished the district attorney to "move on to a different subject," to which the district attorney responded, "Yes, sir."  Additionally, the trial court instructed the jury in writing on this issue by way of Jury Instruction D-7B (Instruction No. 2), which stated in pertinent part: "Do not consider for any purpose any offer of evidence that was rejected, or any evidence that was stricken by the Court; treat it as though you had never heard of it."  The trial court likewise gave its general Instruction No. 1, which stated, *inter alia*, that the jurors were bound by their oath to follow the law as given by the trial court, and that the jury was to disregard all evidence excluded by the trial court and thus not consider this excluded evidence.

¶26.    As we have noted, this Court on appeal generally has the right to presume that jurors will adhere to their oaths and follow the instructions given to them by the trial court. *Walton*, 998 So. 2d at 977 (citing *Wheeler*, 826 So. 2d at 740). Thus, in today's case, we find that any

17

possible prejudice which could have resulted from the witness's unsolicited response to the district attorney's question was cured by the trial judge's prompt remedial action.

### B. Curtileniea Tate's Testimony.

¶27.   Tate also complains about the district attorney's cross-examination of Curtileniea Tate in Tate's case-in-chief.

¶28.   Contrary to the testimony of Deputy Vallely and Rosie Holloway that, at the initial meeting with Deputy Vallely, Curtileniea had done most of the talking, Curtileniea testified that her mother had done all the talking, because she (Curtileniea) did not believe what Brittany was saying about Tate. During the State's cross-examination of Curtileniea, the district attorney questioned her about Exhibit 3, the statement that Brittany had written out and that Brittany and Curtileniea had signed.  Curtileniea was questioned about the portion of the statement where Brittany wrote "I told my mom and she talked to [Tate] and he said he won't do it again,"and Curtileniea testified the statement was not true. Curtileniea was questioned about her testimony that, although she had concluded by August or September of  2007 that Brittany's accusations against Tate were not true, Curtileniea and her mother had taken the "little green wiggle thing" (vibrator) to Deputy Vallely around September 10, 2007. The district attorney likewise questioned Curtileniea about the affidavit (Exhibit 5) she had signed under oath charging Tate with child molestation of Brittany, while at the same time stating that she did not believe the charges to be true.

¶29.   The district attorney then questioned Curtileniea concerning the written statement she eventually took to Deputy Vallely.  This statement, written and signed by Curtileniea, was

marked as Exhibit A for identification, but was never received into evidence. This statement read:

> To Whom it May Concern,
> This is a statement about the conversation that I had with Erick (sic) Tate. My son had the phone and I grabbed it from him, I said hello twice and Erick (sic) said hey its (sic) me and how was I and the boys. I said how the F_ _ _ you think we doing. He said he was sorry. I said what did you do to [Brittany] and he said all the things she said I did I did not do. I told him just doing anything was wrong. I told him charges has (sic) been filled (sic) and he said he wasn't going back to prison, tell his boys he loved them, told me to continue to take care of his boys and don't bring them to his funeral and then he hung up the phone.
> /s/ Curtileniea Tate

Since this statement generated an objection by defense counsel, the trial judge sent the jury out and then heard lengthy arguments from counsel, outside the presence of the jury. Defense counsel's main objections focused on the comments about not going back to prison and not bringing the boys to his funeral. As to the latter comment, defense counsel opined that this was another reference to possible suicide, and defense counsel reminded the trial judge that he already had sustained defense counsel's objection to Deputy Vallely's reference to possible suicide by Tate. In the end, after finding that the comments in this statement were relevant, and after performing the required balancing test,[8] the trial judge stated that the

---

[8]Mississippi Rule of Evidence 401 states: "'Relevant Evidence' means evidence' having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mississippi Rule of Evidence 403 states in pertinent part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."

district attorney could cross-examine Curtileniea about the contents of the statement, with the exception of Curtileniea's comment that "he said he wasn't going back to prison."

¶30. The trial court clearly did not err in allowing the district attorney to cross-examine Curtileniea as to the first part of the statement directly attributable to her. This was classic impeachment of a witness based on inconsistencies in the witness's in-court testimony and out-of-court statements, especially out-of-court statements which she voluntarily put in written form and submitted to Deputy Vallely. The statements attributable to Curtileniea as found in Exhibit A are inconsistent with Curtileniea's in-court testimony that she had questioned the veracity of Brittany's allegations from the very beginning. Curtileniea was provided limitless opportunities either to admit or deny her various in-court and out-court statements. *Johnson v. State*, 905 So. 2d 1209, 1212-13 (Miss. 2005). *See also* Miss. R. Evid. 613. Likewise, at the request of defense counsel, the trial court granted Jury Instruction No. D-7A (Instruction No. 6) (relating to how the jury could consider any witness's testimony deemed by the jury to be false, in whole or in part); and Jury Instruction No. D-12 (Instruction No. 8), which stated in part that "[t]he testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something . . . which is inconsistent with the testimony the witness gave at this trial." Tate no doubt wanted this jury instruction in order to be able to attack Brittany's credibility during closing arguments; however, the jury also could apply this jury instruction in considering and comparing Curtileniea's in-court testimony and her out-of-court statements.

20

¶31. Concerning the district attorney's use of the portions of Exhibit A attributable to Tate in his cross-examination of Curtileniea, we likewise find no error by the trial court in overruling defense counsel's objection. In addition to Curtileniea writing that Tate had said he was sorry and that he did not do what he was accused of doing, according to Curtileniea's statement, Tate also said, *inter alia*, that he was not going back to prison and that Curtileniea should not "bring [their boys] to his funeral." Since the trial judge refused to allow the district attorney to question Curtileniea about Tate's reference to not going back to prison, we focus on the remaining statement which Tate finds objectionable. Tate asserts that the comments in Curtileniea's written statement about not bringing the boys to his funeral is tantamount to an improper reference to suicide.

¶32. Both the State and Tate concede that this Court has never addressed the issue of whether a defendant's attempted suicide or threat of suicide is admissible in an effort to show consciousness of guilt.[9] The State asserts that, while twenty-four states have held that evidence of a defendant's attempted suicide is admissible to show consciousness of guilt, only four states (Illinois, Tennessee, Pennsylvania, and Georgia) have addressed the issue of a defendant's threat to commit suicide *and* found that suicide threats were admissible to

---

[9]On the other hand, this Court has on numerous occasions dealt with the issue of the propriety or impropriety of allowing evidence of flight and flight instructions concerning a defendant's consciousness of guilt. *See e.g.*, **Shumpert v. State**, 935 So. 2d 962, 969-70 (Miss. 2006); **Randolph v. State**, 852 So. 2d 547, 564-66 (Miss. 2002); **Reynolds v. State**, 658 So. 2d 852, 856 (Miss. 1995); **Fuselier v. State**, 468 So. 2d 45, 57 (Miss. 1985).

show consciousness of guilt.[10] Nothing in the record indicates that Tate ever attempted suicide, so our initial inquiry must be whether Tate's statement to Curtileniea that she must not bring their sons to his funeral was a "threat of suicide."

¶33. We briefly turn to the four cases cited by the State for the purpose of determining in each case what act by the defendant was deemed to be "a threat of suicide." In *People v. O'Neil*, 18 Ill. 2d 461, 165 N.E. 2d 319 (1960), the defendant, while being interrogated by law enforcement on an arson charge, "threatened to commit suicide." *O'Neil,* 18 Ill. 2d at 463. In *State v. Seffens*, 1992 WL 75831 (Tenn. Crim. App. March 16, 1992), the defendant, who was charged with multiple counts of aggravated rape and assault of his children and step-children, "threatened to kill his wife and himself because he could get forty years for these offenses." *Seffens*, 1992 WL 75831, *4. In *Commonwealth v. Sanchez*, 416 Pa. Super. 160, 610 A. 2d 1020 (1992), the defendant, who was charged with murder, rape, robbery, and burglary, had "an ideation of suicide," in that he revealed to the prison psychiatric unit personnel that "he was thinking of killing himself." *Sanchez*, 610 A. 2d at 1026, 1028. Finally, in *Duncan v. State*, 269 Ga. App. 4, 602 S.E.2d 908 (2004), the defendant, who was charged with multiple counts of child molestation, on the date that his case was originally set for trial, left his mother and sister a note that "I just think it would be

[10]According to the State, five states have considered this issue; however, since the State does not inform us as to the identity of the fifth state, or supply any case citation from that state, we assume, *arguendo*, that this fifth state found that suicide threats were not admissible to show consciousness of guilt.

better that I'm not around any more," and then attempted suicide by shooting himself in the head. *Duncan*, 602 S.E. 2d at 910.

¶34.   We find the facts of today's case to be distinguishable from the cases just discussed.[11] It is critical that we look at the totality of Tate's statements and the manner in which they were used by the State.  Tate said to Curtileniea to "tell his boys he loved them, told me to continue to take care of his boys and don't bring them to his funeral." At the time the district attorney broached this subject during his cross-examination of Curtileniea, the trial judge sent the jury to the jury room and discussed this issue with counsel outside the jury's presence. The district attorney argued:

> They want to put her up here and let her say she didn't ever believe it, but they don't want to deal with the problems that came with when she did believe it, and Your Honor, it's our position that short of that information about the prison situation, that statement is totally and fully admissible and relevant to this case.

---

[11]On the other hand, Tate directs our attention to *Penalver v. State*, 926 So. 2d 1118 (Fla. 2006).  In *Penalver*, involving a defendant charged with three counts of first-degree murder, when the defendant was first confronted by police with a search warrant, the defendant became upset and resisted police efforts to forcibly remove his shoes, exclaiming "something to the effect of 'I might as well be dead' or 'I want to kill myself.'" *Penalver*, 926 So. 2d at 1132.  The Florida Supreme Court found from the record that it was unclear whether these statements by the defendant "[were] in fact a threat to commit suicide." *Id.* at 1134.  However, the Court concluded: "Moreover, even if the statement is considered a threat, the fact that [the defendant] turned himself in tends to negate the argument that his threat was probative of a desire to avoid prosecution.  Thus, we find that the court erred in admitting this evidence." *Id.*   However, *Penalver* is distinguishable from Tate's case because the record in today's case is devoid of any effort by the State to use Tate's statement about not bringing his boys to his funeral as a suicide threat in an effort to avoid prosecution.

23

Although the trial judge ultimately ruled that the written statement by Curtileniea chronicling what Tate had told her could not be offered into evidence, the trial judge ruled that, with one exception, the district attorney could question Curtileniea about this statement, reasoning:

> She has taken the stand and testified for the defendant that although she signed the affidavit that she does not believe that he did it. The Court has read this statement which apparently was signed by her and given to law enforcement authorities. Again, the portion where it says about where he said he wasn't going back to prison, I find clearly that prejudice of that far outweighs any *relevance*. The remaining portions of the statement do have some relevance as to her conversations with the defendant which she has gotten up here and testified totally on his behalf, and the Court finds that any prejudice from this is outweighed by the *relevancy*, and I will allow the State to question her about the remaining part of the statement.

(Emphasis added).[12]

¶35.    After this ruling by the trial judge, the jury was returned to the courtroom and the district attorney continued his cross-examination of Curtileniea about the statement, omitting the "he-said-he-wasn't-going-back-to-prison" comment. Once Curtileniea was questioned in detail about the contents of the statement and additionally had admitted that she had the conversation with Tate, had written out the statement, and had taken the statement to Deputy Vallely, the district attorney tendered Curtileniea for re-direct examination by defense counsel.

¶36.    Of significant import is the method in which the State used this evidence concerning Curtileniea's testimony about her memorializing in the written statement what Tate had told

---

[12]Rule 403 requires the weighing of otherwise relevant evidence via a *probative value* versus prejudice analysis, not *relevance* versus prejudice. Miss. R. Evid. 403. The trial judge's ruling in this regard will be discussed in more detail, *infra*.

her.  During the first phase of the State's closing argument to the jury, the assistant district attorney stated:

> You heard from his wife, Mrs. Curtileniea Tate tell you, "He wouldn't even talk to me about it.  He told me I needed to call my mama to find out what was going on." Is that not the most ridiculous thing you have ever heard in your life.  He didn't deny it. Then she comes to law enforcement, and she gives them a statement, and she says in the statement that she wrote for Deputy Vallely that she brought to him. "He said he was sorry.  He said tell my boys I love them. Don't bring them to my funeral."  That's the kind of thing that guilty people write, ladies and gentlemen.

At this point, defense counsel objected, not on the basis of any perceived reference to suicide or guilty knowledge, but instead, on the basis that "[the assistant district attorney] read the statement, but she did not read the complete statement where he said he did not do this."

¶37.   The only other reference to the objectionable statement is during the final portion of the State's closing arguments when the district attorney again read the statement (with the exception of the "he-said-he-wasn't-going-back-to-prison" comment) to the jury when discussing the fact that Curtileniea had been questioned about this statement on cross-examination. The district attorney then argued:

> Now, [defense counsel] wants you to say, well he says he didn't do it in here because it says Eric said hey – I said what did you do to [Brittany] and he said all the things she said I did I did not do.  I submit to you, the way that reads is he said all the things she said I did I did not do. And I – the reason I believe is, well, because then she says I told him just doing anything was wrong. So he's admitting it here, folks.
>
> BY [DEFENSE COUNSEL]: Objection, Your Honor.
>
> BY THE COURT: Again, let's move on, Mr. Harper.
>
> BY [DEFENSE COUNSEL]: It's incredible.

25

BY [THE DISTRICT ATTORNEY]: What do you mean it's incredible. It's exactly what he says.

BY THE COURT: Just a second. Mr. Harper, you have about one minute. You've got about one minute. Let's wrap it up. Time is running out. You've got about one minute left.

BY [THE DISTRICT ATTORNEY]: I said what did you do to [Brittany], and he said all the things she said I did I did not do. I told him just doing anything was wrong. Y'all can interpret that any way you want to. Ladies and gentlemen, I think the case is clear. It's clear. [Defense counsel] calls his man the victim. I tell you, the victim is sitting right out there, and he told y'all yesterday morning, I remember this because he talked about Mrs. Holloway, the child's grandmother. Said she had a controlling spirit. Well, when his wife was testifying today, she said something about that she needed to get control of [Brittany], and then after he made these accusations and his wife had left him and was doing everything she could to help prove that he did these things, then she goes back to him. Y'all tell me who's got the controlling spirit in this picture.

This concluded the State's closing argument.

¶38. From the record before us, it is obvious that the State was not attempting to single out any perceived threat of suicide by Tate as being evidence of consciousness of guilt. The only time anyone made any reference to consciousness of guilt was when the assistant district attorney stated to the jury "That's the kind of thing that guilty people write." However, the assistant district attorney, in referring to "[t]hat's the kind of thing . . ." was referring not to one, but three statements by Tate: "'He said he was sorry. He said tell my boys I love them. Don't bring them to my funeral.' That's the kind of thing that guilty people write, ladies and gentlemen."

¶39. We find from the totality of the evidence that there was no effort to prove via alleged suicide threats that Tate possessed a "consciousness of guilt." Additionally, no jury

26

instruction was submitted to, or considered by, the trial judge informing the jury that it could consider whether Tate's purported "suicide threats" showed consciousness of guilt. We thus decline to address on a case of first impression whether evidence of threats of suicide by the defendant in a criminal case is admissible in an effort by the State to prove the defendant's consciousness of guilt.

¶40.   Finally, while we concede that the learned trial judge in this case did not utter verbatim the words found in Mississippi Rule of Evidence 403, the trial judge properly conducted the required Rule 403 analysis with regard to Exhibit A prior to ruling on this evidence. This Court previously has stated:

> [The defendant] argues that such evidence should be subjected to a balancing test pursuant to the provisions of Miss. R. Evid. 403 and our case law. Indeed, the record does not reveal that the trial court performed a Rule 403 balancing test. Even though a trial judge's determination on the issue of admissibility of evidence must ultimately be filtered through Rule 403, a trial judge's failure to place Rule 403's magic words into the record does not necessarily create the presumption that the trial judge failed to consider Rule 403's requirements, nor does it automatically render the trial judge's decision on admissibility to be error, much less reversible error.

*Havard v. State*, 928 So. 2d 771, 797 (Miss. 2006) (footnote omitted). In *Havard*, a death penalty case, we ultimately determined that the trial judge's admission of certain photographic evidence was not an abuse of discretion and concluded that "the probative value of this relevant evidence was not substantially outweighed by the danger of unfair prejudice." *Id.* at 797-98.

¶41.   In today's case, the record clearly reveals that the trial judge performed an on-the-record Rule 403 analysis, albeit in less-than-perfect language, by stating "[t]he remaining

portions of the statement do have some relevance as to her conversations with the defendant which she has gotten up here and testified totally on his behalf, and the Court finds that any prejudice from this is outweighed by the *relevancy*, and I will allow the State to question her about the remaining part of the statement." (Emphasis added). We find that, although the "magic words" referenced in ***Havard*** were not uttered by the trial judge in today's case, the Rule 403 analysis was performed on this evidence, and the trial judge did not abuse his discretion in allowing the district attorney to cross-examine Curtileniea Tate on the statement she wrote out and presented to Deputy Valley. *See* ***Turner***, 3 So. 3d at 744.

¶42. Alternatively, even if we were to find error in the trial court's allowing the district attorney to cross-examine Curtileniea about the handwritten statement she gave to Deputy Vallely, such error, if any, was harmless beyond a reasonable doubt. ***McKee v. State***, 791 So. 2d 804, 810 (Miss. 2001) (error is harmless when apparent from record that fair-minded jury could arrive at no verdict other than guilty) (citations omitted). "Where the prejudice from erroneous admission of evidence dims in comparison to other overwhelming evidence, this Court has refused to reverse." ***Carter v. State***, 722 So. 2d 1258, 1262 (Miss. 1998) (citing ***Holland v. State***, 587 So. 2d 848, 864 (Miss. 1991)). As will be discussed in more detail under a separate assignment of error, the evidence of Tate's guilt was overwhelming, absent any reference to Tate's statement about not bringing his boys to his funeral. Such conclusion is based on the testimony of Brittany, Dr. Leigh Gray, Deputy Sheriff Bill Vallely and Rosie Holloway.

¶43. For all the reasons stated, we find this assignment of error to have no merit.

28

### III. WHETHER THE TRIAL COURT ERRED BY FAILING TO EXAMINE INDIVIDUAL JURORS OR TO GRANT A MISTRIAL ONCE THE JURY PANEL WAS EXPOSED TO PREJUDICIAL INFORMATION.

¶44. Both the trial judge and the district attorney conducted their respective voir dire examinations without incident. Defense counsel had almost concluded his voir dire on behalf of Tate, likewise without incident, when defense counsel asked a catch-all question of the jury venire:

> BY [DEFENSE COUNSEL]: Thank you so much. Anyone else? There's something that you should have asked me, the attorneys. If you had asked me this question, I would have told you this. I would have told you that, or – you know – I simply can't sit on this jury. Know the type of crime. I can't do it because I can't be fair. I cannot be fair. Anyone that thinks that? Somebody else want to share with us? You're sure? Juror number ten.

> BY JUROR HOLMES: I know Mr. Tate. Mr. Tate's cousin and my son are very good friends, and they have been friends for a while, and Mr. Tate along with his cousin and my son have had outings together, and I have heard of this before now.

> BY [DEFENSE COUNSEL]: I am sorry. You did what?

> BY JUROR HOLMES: I have heard of this – what's going on in this case.

> BY [DEFENSE COUNSEL]: You've heard of it?

> BY JUROR HOLMES: I've heard of it before now, and I heard of another case that involved Mr. Tate also.

> BY [DEFENSE COUNSEL]: Thank you so much for your response. Now is there anybody else? If that lawyer had asked me this question, I would have told you this. You're juror number ten, correct?

> BY JUROR HOLMES: Right.

> BY [DEFENSE COUNSEL]: Your Honor, that's all I have. Can we approach?

29

BY THE COURT: Yes, sir.

After a nonrecorded bench conference, the trial judge announced to the jury venire that he was declaring a thirty-minute recess to complete the jury selection process, and the trial judge admonished the members of the venire, *inter alia*, that they were to have no contact or conversation with anyone about this case during the recess.

¶45.    In chambers, defense counsel moved for a mistrial based on Juror Holmes's response that she knew about another case involving Tate.  Defense counsel also informed the trial judge that at the time Juror Holmes made the comment about another case involving Tate, he (defense counsel) noticed another female member of the jury panel smiling.  After arguments of counsel, the trial judge denied the motion for a mistrial, but announced that he would remove Juror Holmes for cause, and that he would also remove for cause the smiling juror once the identity of that particular juror was known, although the trial judge expressed confidence that the smiling juror was so far down the list, based on defense counsel's description of where she was seated in the courtroom, that she would never be considered as a member of the trial jury for this particular case.  Likewise, the trial judge stated that the jury would be properly instructed on the law and how the jury must consider its verdict.  After considering challenges for cause, the trial judge declared a recess so counsel could consider how they wanted to exercise their peremptory challenges.

¶46.    Upon reconvening in chambers for the jury selection process, the trial judge was informed by defense counsel that during the recess, it was brought to his (defense counsel's) attention by Curtileniea that she had overheard "four or five" prospective jurors sitting on a

30

bench outside the courtroom discussing "what other case [Tate] had against him." The trial

judge placed Curtileniea under oath, and she testified as to what she had heard and observed

regarding this juror conduct. In response to questioning, Curtileniea testified that one lady

mentioned to the other (three or four) venire members "[w]hat other case he had," and

Curtileniea testified that no one responded to this comment by the prospective female juror.

The trial judge again denied defense counsel's motion for a mistrial, but offered to take

"curative action" such as strongly instructing the venire members to disregard the comments

made by Juror Holmes. The trial judge likewise offered to afford defense counsel "additional

challenges as to these jurors" if the identity of the four or five jurors described by Curtileniea

as discussing this "other case" could be ascertained. The trial judge, however, refused

defense counsel's request to reopen voir dire. On the other hand, the trial judge again offered

to admonish the jury venire to disregard Juror Holmes's comments, but that "I have to be

requested at some point to do that." At this stage of the proceedings, the trial judge was

unable to ascertain if the "four or five" members of the venire mentioned by Curtileniea were

close enough to the top of the venire list to be considered for jury service on Tate's case.

¶47. Once the trial jury was selected, the trial judge again offered to defense counsel that

once the jury was seated in open court, if Curtileniea informed defense counsel that she

recognized one or more members of the trial jury as having been among the venire members

discussing "the other case," defense counsel should inform the trial judge so that curative

action could be taken. Likewise, the trial judge again inquired of defense counsel if he

wished for the jury to receive any additional instruction regarding the comments made by

31

Juror Holmes. After considerable discussion by the trial judge with all counsel, the trial jury was seated in open court, and the trial judge gave the customary instructions to the jurors regarding their conduct. The following then occurred:

> BY THE COURT: Now, also I am going to instruct you at this time that you are to completely and totally disregard any comment that may have been made on voir dire about any other case against this defendant because there is no other case.[13] Does everybody understand that?
>
> BY THE JURORS: Yes, sir.
>
> BY THE COURT: Can you each follow the Court's instructions in that regard?
>
> BY THE JURORS: Yes, sir.
>
> BY THE COURT: Let the record show that each juror has nodded affirmatively.

The jury was then put in recess for lunch. The members of the jury likewise were reminded that throughout the trial, during any recess, they were to have no contact or discussions with anyone about the case.

¶48.    As noted in our discussion of Issue I, *supra*, our standard of review on a claim that the trial court committed error in refusing to grant a mistrial is one of abuse of discretion. ***Dora***, 986 So. 2d at 921. As we recently stated in applying this abuse-of-discretion standard: "[T]he trial court is in the best position to determine if an alleged improper comment had a prejudicial effect; therefore, absent an abuse of that discretion, the trial court's ruling will

---

[13]There was in fact another case pending against Tate, and this was a matter of contention between the district attorney and the trial judge during the in-chambers discussion with counsel as to how to admonish the trial jury to disregard the comments made by Juror Holmes during voir dire.

32

stand." ***Jones v. State***, 962 So. 2d 1263, 1275 (Miss. 2007) (citing ***Stevens v. State***, 806 So. 2d 1031, 1057 (Miss. 2001)) (addressing alleged improper comment by prosecutor during closing arguments). *See also* ***Slaughter v. State***, 815 So. 2d 1122, 1131 (Miss. 2002).

¶49. More to the point, this Court in recent times has addressed this precise issue of alleged prejudicial comments by venire members during voir dire. In ***Shelton v. State***, 853 So. 2d 1171, 1182-84 (Miss. 2003), the defendant was on trial for capital murder, and during voir dire, a venire member volunteered information that she had heard the defendant had been tried before on the same charges, resulting in "a hung jury." ***Id.*** at 1183. In denying a motion for a mistrial, the trial judge "acknowledged that a few prospective jurors heard that this was a second trial for [the defendant], but that the information would not affect their ability to make a decision." ***Id.*** at 1184. This Court found that the trial judge did not abuse her discretion in denying the motion for a mistrial inasmuch as "[t]here was no showing of misconduct that resulted in substantial or irreparable harm to [the defendant's] case pursuant to URCCC 3.12."[14] ***Id.***

¶50. In applying this law to the facts of today's case, it is clear from the record that the trial judge zealously protected Tate's rights to a fair trial, to the point of admonishing the jury that it was "to completely and totally disregard any comment that may have been made on voir dire about any other case against this defendant because there is no other case," when

---

[14]Uniform Circuit and County Court Rule 3.12 states in pertinent part that the trial court may declare a mistrial if, during the trial, there is misconduct "resulting in substantial and irreparable prejudice" to a party's case.

in fact, the record reveals that there was another case pending against the defendant. The members of the trial jury responded affirmatively that they would disregard any comments about another case and that they would "follow the Court's instructions in that regard." Recognizing that (1) the trial judge is in the best position to gauge the effect of any objectionable comment by the venire member; (2) the trial judge admonished the trial jury to disregard the objectionable comment; and (3) the law presumes that jurors follow the trial judge's instructions, we find that there was no abuse of discretion by the trial judge when he denied Tate's motion for a mistrial concerning Juror Holmes's comments that she had "heard of another case that involved Mr. Tate also." Consistent with his curative action concerning the comments made by Juror Holmes, the trial judge likewise offered to consider striking "the smiling juror" if her identity could be ascertained. Also, the trial judge offered defense counsel additional challenges if the identity of the "four or five" venire members Curtileniea testified had discussed "the other case" against Tate during a recess became known, and/or if Curtileniea recognized any of these venire members once the trial jury was seated. The record is silent as to whether Curtileniea later came forward with any such information regarding any of the venire members who ultimately were seated in the trial jury. Stated differently, nothing in the record reveals that defense counsel thereafter requested the trial judge to remove any of the jurors who ultimately were seated.

¶51. For all these reasons, we find this issue to be without merit.

### IV. WHETHER THE TRIAL COURT ERRED BY DENYING THE MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, ON IN THE ALTERNATIVE, FOR A NEW TRIAL.

34

¶52.    A motion for judgment notwithstanding the verdict attacks the legal sufficiency of the evidence, while a motion for a new trial attacks the weight of the evidence. ***Bush v. State***, 895 So. 2d 836, 843-44 (Miss. 2005).  In ***Bush***, we took the opportunity to reiterate the critical distinctions between an attack on the legal sufficiency of the evidence as opposed to an attack on the weight of the evidence. ***Id.***

¶53.    Looking first to the issue of whether the evidence was legally sufficient to undergird the guilty verdicts against Tate, we must determine whether, when we consider the evidence in this case, as well as all reasonable inferences which may reasonably be drawn from the evidence, in the light most favorable to the prosecution, reasonable and fair minded jurors exercising impartial judgment might reach different conclusions as to each element of the charged offense.  ***Id.*** at 843. If such inquiry is answered in the affirmative, the evidence is deemed to be legally sufficient to sustain the conviction.  ***Id.***  *See also* ***Christmas v. State***, 10 So. 3d 413, 422 (Miss. 2009) ("relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (citing ***Bush***, 895 So. 2d at 843).

¶54.    With this in mind, the indictment asserts, *inter alia*, that Tate, while in a position of authority over Brittany by virtue of being her step-parent, committed sexual battery upon Brittany by engaging in sexual penetration with Brittany, a female child under eighteen years of age (Count I); that Tate, being over eighteen years of age (and Brittany being under sixteen years of age), fondled Brittany's genitals (Count II); and that Tate, being over

35

eighteen years of age (and Brittany being under sixteen years of age) fondled Brittany's breasts (Count III).

¶55.    As to Count I, Mississippi Code Section 97-3-95(2) states in pertinent part that "[a] person is guilt of sexual battery if he or she engages in sexual penetration with a child under the age of eighteen (18) years if the person is in a position of trust or authority over the child including without limitation the child's . . . legal guardian, parent, stepparent . . . ." Additionally, Section 97-3-97 provides in pertinent part that:

> For purposes of Sections 97-3-95 through 97-3-103 the following words shall have the meaning ascribed herein unless the context otherwise requires:
>
> > (a) "Sexual penetration" includes cunnilingus, fellatio, buggery or pederasty, any penetration of the genital or anal openings of another person's body by any part of a person's body, and insertion of any object into the genital or anal openings of another person's body.

Miss. Code Ann. § 97-3-97 (Rev. 2006).

As to Counts II and III, Mississippi Code Section 97-5-23(1) provides that: "(1) Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, any child under the age of sixteen (16) years, with out without the child's consent . . . shall be guilty of a felony. . . ."   Miss. Code Ann. § 97-5-23 (Rev. 2006).

¶56.    Here, Brittany testified about Tate, her stepfather, fondling her breasts and touching her in her vaginal area, as well as inserting a vibrator into her vagina and attempting vaginal

36

penetration with his penis. During this period of time, Brittany was between nine and ten years of age. Brittany's grandmother, Rosie Holloway, testified about overhearing a telephone conversation between Brittany and Tate, and standing so close to Brittany that she could overhear Tate on the phone telling Brittany what clothes to wear and Brittany responding that she no longer wore "those kind of clothes anymore." Holloway said she immediately confronted Brittany, who admitted that Tate was "touching her." Dr. Leigh Gray, a physician specializing in obstetrics and gynecology, testified that her examination of Brittany revealed "tears in her hymen which were consistent with evidence of trauma." On several occasions, Tate also inserted "a little green wiggle thing" into her vagina. This item, which was described as resembling a writing pen, but in essence being a vibrator, was discovered by Holloway and Curtileniea in their search of Tate's room after the molestation charges surfaced. Brittany likewise testified that on at least one occasion, Tate tried to put his "private part" inside her, but "it wouldn't fit." After Tate tried to penetrate Brittany's vagina with his penis, he called Brittany to the bathroom, where Tate unbuttoned his boxer shorts, exposed his penis to Brittany and told her that the white excretion on his penis was "cum stuff." Even this brief account of the evidence is more than legally sufficient to sustain the convictions for sexual battery and child-fondling. In addition to the evidence depicted immediately above, upon consideration of the entire record in this case, we reach the inescapable conclusion that the evidence against Tate is legally sufficient to undergird the jury's finding of guilt as to the sexual battery and child-fondling charges.

37

¶57. On the other hand, when this Court is requested to find that a new trial is warranted based on the weight of the evidence, we cannot disturb a jury verdict of guilty unless we find that the verdict "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)). *See also* Miss. Unif. Cir. & Cty. R. 10.05 (1)(2). In order to provide relief via a reversal of a conviction on a weight-of-the-evidence issue, this Court must find that the trial court abused its discretion when it denied a motion for a new trial challenging the weight of the evidence. *Parramore v. State*, 5 So. 3d 1074, 1078 (Miss. 2009) (citing *Wilkins v. State*, 1 So. 3d 850, 854 (Miss. 2008)). Again, when we consider the record before us, including all the evidence discussed throughout this opinion, we can safely conclude that the trial court did not sanction an unconscionable injustice by allowing the guilty verdicts to stand; thus, the trial court did not abuse its discretion in denying Tate's motion for a new trial.

¶58. For the reasons stated, we find that this issue has no merit.

**CONCLUSION**

¶59. Having fully addressed the issues presented to us and finding them all to be without merit, we affirm the Amite County Circuit Court's judgment of conviction entered against Eric Tate for one count of sexual battery and two counts of child-fondling, and the resulting imposition of sentences of thirty years imprisonment on the sexual battery conviction and ten years imprisonment on each of the child-fondling convictions, to run consecutively.

38

**¶60.   COUNT I: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.   COUNT II: CONVICTION OF CHILD FONDLING AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.   COUNT III; CONVICTION OF CHILD-FONDLING AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.  SENTENCES SHALL RUN CONSECUTIVELY.**

**WALLER, C.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., NOT PARTICIPATING.**